[S.F. No. 25038. Oct. 17, 1988.]

DAVID MOLKO, Plaintiff, Cross-defendant and Appellant;
TRACY LEAL, Plaintiff and Appellant, v.
HOLY SPIRIT ASSOCIATION FOR THE UNIFICATION OF
WORLD CHRISTIANITY et al., Defendants, Cross-complainants and
Appellants;
NEIL MAXWELL, Cross-defendant and Respondent.

1094

**COUNSEL**

Ford Greene, Shapiro & Shapiro, Carl Shapiro, Lynn M. Rennert, Stanley F. Leal, Kelly, Leal, Olimpia, Davilla & Whelan, Kelly, Leal & Davilla and Kelly, Leal & Olimpia for Plaintiff, Cross-defendant and Appellant, Plaintiff and Appellant and Cross-defendant and Respondent.

Jeffrey S. Ross, James A. Dorskind, Friedman, Sloan & Ross and Lawrence A. Gibbs for Defendants, Cross-complainants and Appellants.

Harold J. Kwalwasser, Robin D. Wiener, Tuttle & Taylor, Paul Morantz, Robert H. Philibosian, Morton B. Jackson, MacDonald, Halsted & Laybourne, Baker & McKenzie, Bruce J. Ennis, Donald N. Bersoff, Kit Adelman-Pierson, Ennis, Friedman & Bersoff, Michael J. Woodruff, Samuel E. Ericsson, Michael A. Paulsen, Heidi S. Hagerman, Earl W. Trent, Jr., and Remcho, Johansen & Purcell as Amici Curiae.

**OPINION**

**MOSK, J.**—This case raises three issues: (1) whether, consistently with the free exercise clause of the First Amendment of the United States Constitution and of article I, section 4, of the California Constitution, former members of a religious organization may sue that organization on various causes of action arising out of its allegedly deceptive recruitment practices; (2) whether the organization may cross-complain against a former member and others for allegedly violating its civil rights under federal and state statutes;

and (3) whether California's equitable indemnity doctrine permits an intentional tortfeasor to obtain indemnity from concurrent intentional tortfeasors on a comparative fault basis.

Appellants David Molko and Tracy Leal are former members of the Unification Church.[1] While members of the Church, they were on separate occasions forcibly abducted from a public street by third parties and "deprogrammed"—i.e., persuaded to relinquish their belief in and association with the Church. Thereafter Molko and Leal filed the present action against the Church, alleging they had been fraudulently induced to join the Church through a variety of deceptive tactics on the part of some of its members. Molko and Leal each asserted causes of action for fraud and deceit, intentional infliction of emotional distress, and false imprisonment. Molko also sought restitution of a $6,000 gift he alleged the Church obtained from him by undue influence.

The Church filed a first amended cross-complaint against Molko and Neil Maxwell,[2] alleging their deprogramming activities violated the Church's federal and state civil rights.[3] (42 U.S.C. § 1985(3); Civ. Code, §§ 51.7, 52.) The Church also sued Maxwell for full or partial indemnity, on the theory that Maxwell, by kidnapping and deprogramming Molko, had wholly or partially caused any damages for which the Church might be found liable to Molko.

The court granted summary judgment for the Church in the action brought by Molko and Leal, and entered a judgment of dismissal for Molko after sustaining his demurrer without leave to amend as to the Church's amended cross-complaint against him. Similarly, the court entered a judgment of dismissal for Maxwell after sustaining his demurrer without leave to amend as to the Church's amended cross-complaint against him.

Molko and Leal appealed from the summary judgment for the Church. The Church cross-appealed from the judgment of dismissal for Molko, and appealed from the judgment of dismissal for Maxwell and Alexander. The

---

[1] We use the names "Unification Church" and "the Church" to refer collectively to the Holy Spirit Association for the Unification of World Christianity and New Education Development Systems, Inc. While the two organizations are apparently separate entities, we need not differentiate between them for purposes of this opinion.

[2] The cross-complaint also named Joseph Alexander, Sr., Stanley F. Leal, Virginia Mabry, and Judy Powell as cross-defendants. Those parties are not involved in the present appeal.

[3] The Church alleged that Molko, after his own deprogramming, became involved in kidnapping and deprogramming other Church members.

Court of Appeal consolidated all the appeals; it affirmed the summary judgment for the Church, but reversed the judgments of dismissal for Molko, Maxwell, and Alexander. We granted petitions by Molko and Leal to review the affirmance of summary judgment for the Church, and by Maxwell to review the reversal of his judgment of dismissal.[4]

As will appear, we conclude that (1) the summary judgment for the Church should be affirmed as to the cause of action for false imprisonment but reversed as to the causes of action for fraud, intentional infliction of emotional distress, and restitution, and (2) the reversal of the judgment of dismissal for Maxwell should be affirmed.

## I. FACTS

### A. *Facts as to David Molko*[5]

In June 1978 27-year-old David Molko graduated from Temple University School of Law. A month later he took and passed the Pennsylvania bar examination. In spite of these educational successes, he was unsure about his future. He considered moving to California, and decided to visit San Francisco, perhaps to find a job or take the California bar examination. He arrived in San Francisco in early January 1979.

On Sunday, January 21, Mark Bush and Ernest Patton approached Molko as he waited at a bus stop in San Francisco. Bush and Patton told Molko they lived in an "international community" of socially conscious people from different occupations who met in the evenings to discuss important issues. They invited Molko to come to dinner that evening. Molko asked the two their occupations and was told they did social work and worked with environmental programs. He asked if Bush and Patton had a "religious connection." They said "no." Bush and Patton did not reveal to Molko that they were members of the Unification Church, or that their purpose in approaching him and inviting him to dinner was to recruit him into the Church.

Molko attended the dinner, at which there appeared to be a number of other invited guests. He was kept apart from the other guests, and during

---

[4] Neither Molko nor Alexander sought review of the reversals of their judgments of dismissal.

[5] Molko, Leal, and the Church have stipulated that the deposition testimony of Tracy Leal, David Molko, Stanley F. Leal, Collette Zeilinski, and Ernest Gibbs Patton, Jr.—which was extensively quoted in the papers supporting and opposing the Church's motion for summary judgment—be included in the clerk's transcript on appeal. Accordingly, we take judicial notice of the deposition transcripts and consider them part of the record for purposes of this appeal. (Evid. Code, § 452, subd. (d).)

dinner was held in constant conversation with group members. After dinner there was a lecture on general social problems, followed by a slide show on "Boonville"—a "farm" a few hours to the north, owned by the group at the house. The slide show depicted Boonville as a rural getaway where people from the house went for relaxation and pleasure. When the presentation was concluded, all the dinner guests were invited to visit the farm. Bush, Patton, and another group member, David Hager, strongly urged Molko to accept the invitation, and told him a van would be leaving for Boonville in a few minutes. Molko said he had no personal belongings with him, and he preferred to think about it. The group members assured him they would provide for all his needs, and again urged him to go. Impressed by this hospitality and enthusiasm, Molko finally agreed to go. At their request he then filled out and signed a form declaring his name, address, and telephone number,[6] and 15 minutes later was in a van on his way to Boonville. He did not know and was not told Boonville was an indoctrination facility for the Unification Church.

The van arrived at Boonville several hours later. Molko was given a sleeping bag and shown to a shelter where others were already sleeping. He quickly fell asleep, and awoke the next morning to discover that many more people than just the 12 from the van were sleeping in the large room. When he arose and walked to the bathroom, a group member arose and walked with him. Wherever he went, a group member accompanied him.

Molko expected to spend some relaxed time in the country, but soon learned the day's schedule was tightly planned and left him no time to himself. First came group calisthenics, then breakfast, then a lecture on moral and ethical issues, followed by small group discussions of the lecture. Next came lunch, more exercise, another lecture and discussion, then a break to take a shower. Finally came dinner, "testimonials" by individuals about their lives and their impressions of the day at Boonville, and group singing followed by yet another small group discussion. At the end of the day Molko was exhausted and quickly fell asleep.

Tuesday was a repeat of Monday, except that Molko became acquainted with group member Bethie Rubenstein. He asked her the name of the group, and she told him it was the "Creative Community Project." He asked if the group was associated with any religious organization, and she told him "no." By the end of Tuesday, Molko was tired, uncomfortable and

---

[6] The Church claims the form identified the program at Boonville as being associated with the Unification Church. Molko claims it did not. The Court of Appeal acknowledged this created a factual dispute, but deemed the dispute immaterial because of the conclusions the court reached in holding the Church was entitled to summary judgment. Because we reach different conclusions, we do not, as will be seen, find the dispute immaterial.

concerned about the direction his life was taking. He informed Patton and Bush he desired to return to San Francisco. They told him he was free to leave and that a bus would depart at three o'clock in the morning, but they strongly urged him to stay and hear the important information that would be discussed in the days to come. Molko agreed to stay on a little longer.

Wednesday and Thursday were exactly like Monday and Tuesday—even the two-day cycle of lectures was repeated verbatim. The lecturers spoke of brotherly love and social problems, and included references to God and some amount of prayer. On Wednesday, Rubenstein informed Molko the group's teachings derived from many philosophical sources, including Aristotle, Jefferson, and Reverend Sun Myung Moon. She did not disclose that Reverend Moon was the group's spiritual leader.

On Friday night, Molko was told the group was about to leave Boonville for "Camp K"—another group-owned retreat used on weekends. Molko said he wanted to return to San Francisco, but again was urged to give the group a few more days. He agreed and made the trip to Camp K, still oblivious of his involvement with the Unification Church.

The exercise-lecture-discussion regimen continued throughout both the weekend at Camp K and the following week back at Boonville, during which Molko became increasingly disoriented and despairing of his future. On Friday—his 12th day of continuous group activity—Molko once again asked if the group was involved with any larger organization. Finally, a member named Gloria revealed to him for the first time that the group was part of the Unification Church. He was confused and angry, but was informed the deception was necessary because people who had heard negative stories about the Church tended to be unreceptive if they knew the group's identity before hearing what it had to say. He agreed to stay and try to work out his confusion.

That night he returned to Camp K, where he remained for approximately five to seven weeks of "advanced training." The same regimen and structure continued during this period. Molko's parents, concerned about his welfare, flew from Florida in late February to talk to him. They stayed a week, but saw their son for only a few hours, and only in the presence of Church members. The parents urged him to come home briefly, but he refused. Molko—who by this time had been taught that his parents were agents of Satan trying to tempt him away from the Church—was confused by the visit, but remained with the Church. His parents returned to Florida.

On finishing his advanced training at Camp K, Molko was judged ready to go back to the city to sell flowers and "witness"[7] for the Church. Shortly thereafter, in early April, two Church leaders told Molko the Church desperately needed funds for taxes, and urged him to give money. He donated $6,000 to the Church. Sometime during this period he also became a formal Church member.

Church leaders advised Molko he could help the Church most by becoming a member of the bar, and promised that the Church would pay for his bar review course. He agreed, and studied for and took the California bar examination while living in the Church's San Francisco house. As he left the final session of the bar examination, however, Molko was abducted and taken to a motel by "deprogrammers" hired by his parents. After three days of deprogramming, Molko terminated his association with the Unification Church.

B. *Facts as to Tracy Leal*

In June 1979 19-year-old Tracy Leal completed her freshman year at San Diego State University. She had found the college large and impersonal; she considered transferring to Humboldt State University in northern California, but desired to visit the school before applying for admission. To that end she bought a bus ticket to Humboldt and set out on Sunday, June 7. The trip required changing busses in San Francisco.

While waiting for her bus in San Francisco, Leal was approached by Unification Church member Collette Zielinski, who was witnessing for the Church. Zielinski told Leal she was waiting for a friend arriving from Switzerland. Leal remarked that she loved to ski and had always wanted to go to Switzerland. Zielinski said her friend was also a skier and perhaps Leal would like to talk to her. Church member Bradford Parker then arrived, and Zielinski and Parker told Leal about the house in which they lived. They said they were part of the "Creative Community Project," described as a group of socially concerned professional people involved in good works such as giving food to the poor. They invited Leal to have lunch and go sightseeing with them, then join them for dinner at the house. They assured Leal she could catch another bus to Humboldt later that evening. Leal asked if Zielinski and Parker were part of a religious group, and said she did not want to get involved with them if they were. They replied only

---

[7] "Witnessing" is the Unification Church's name for the process of recruiting new members on the street. Bush and Patton, for example, were witnessing when they persuaded Molko to come to dinner.

Open and candid witnessing is employed by other religious denominations.

that the people in their group "all came from different religious backgrounds." Leal accepted their invitation.

That evening Leal went to the group's house for dinner. Like David Molko, she was kept apart from other dinner guests and was held in constant conversation with Church members. She heard the same lecture, saw the slide show on Boonville, and received the same invitation to go there. She accepted the invitation, signed the same kind of form,[8] and a few minutes later was on the bus to Boonville. Like Molko, she did not know Boonville was part of the Unification Church.

At Boonville Leal experienced the same exercise-lecture-discussion regimen Molko received five months earlier. On Tuesday, her second day at Boonville, she asked Joshua, a codirector of the camp, whether the group was part of a religious organization, and specifically whether they were "Moonies." Joshua said they were not Moonies, but were a form of Christian group. He said, however, they were "keeping quiet about it for a while" because they did not want to frighten people away.

After two days at Boonville, Leal went for a two-week seminar at Camp K. During this period she experienced the same type of doubts and fears as had Molko. At the end of the two weeks, she again asked Zielinski and Parker if the organization was "part of the Moonies." They assured her it was not. Later that evening they added that, while they were not Moonies, they did follow some of the teachings of Reverend Moon. Five days later—twenty-two days after recruiting Leal at the bus depot—they informed Leal they were in fact part of the Unification Church.

Leal remained with the group after learning its identity. During the next two months her family visited her and tried to convince her to get away from the Church for a while. She told her parents she would not leave the house with them for fear of being abducted and deprogrammed. On September 1 Leal flew to Boulder, Colorado, for a month-long series of advanced lectures, at the conclusion of which she became a formal Church member. From Boulder she went to Los Angeles, where she sold flowers on the street to raise money for the Church. On October 29, Leal was abducted from a Los Angeles street by deprogrammers hired by her parents. The deprogrammers successfully persuaded Leal to abandon her association with the Unification Church.

---

[8] Leal states the form she signed did not identify the Unification Church. She took it to be some kind of "hold harmless" form for the trip to Boonville.

## II. Fraud and Deceit

### A. *Standard of Review*

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) ■ The purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].) Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [116 P.2d 62].)

Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) It should therefore be used with caution, so that it does not become a substitute for trial. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. (*Stationers Corp.* v. *Dun & Bradstreet* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 437 [74 Cal.Rptr. 895, 450 P.2d 271].)

■ A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. (*Stationers Corp.* v. *Dun & Bradstreet, supra,* 62 Cal.2d at p. 417.) To succeed, the defendant must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial. (*Ibid.*) We shall examine the grant of summary judgment in this case with the foregoing standard in mind.[9]

---

[9] The Church argues that under *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244 [208 Cal.Rptr. 137, 690 P.2d 610], summary judgment should be deemed a "favored remedy" and viewed under a standard more favorable to the Church because the case involves the exercise of religious rights. While similar suggestions have been made elsewhere (see Comment, *Religious Torts: Applying the Consent Doctrine as Definitional Balancing* (1986) 19 U.C. Davis L. Rev. 949, 972-973), we decline the Church's invitation to elevate the standard here. As we stated in *Reader's Digest,* the higher standard for summary judgment in defamation cases is necessary because a verdict in such actions requires that actual malice be shown by clear and convincing evidence. (37 Cal.3d at p. 252.) No such necessity exists here.

## B. *Nature of the Fraud Claim*

■ The necessary elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage. (*Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291].) Molko and Leal contend specified members of the Unification Church knowingly misrepresented the Church's identity with the intent to induce each of them to associate with and ultimately join the Church. Molko and Leal further contend they justifiably relied on those misrepresentations in unknowingly agreeing to participate in Church activities, and suffered psychological and financial damage as a result of their involvement with and membership in the Unification Church. They state they would not have chosen to associate with the Church had they known its true identity.

The Church concedes for pleading purposes its members knowingly misrepresented the Church's identity to Molko and Leal. It further concedes the misrepresentations were made with the intent to induce Molko and Leal first to associate with Church recruiters and later to continue participating in Church activities. Nor, finally, does the Church contest plaintiffs' claims that they suffered damages as a result of their involvement with the Church. The Church contends, however, that it is entitled to summary judgment because the undisputed facts conclusively negate the element of justifiable reliance.

■ Justifiable reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which alters his legal relations, and when without such misrepresentation or nondisclosure he would not, in all reasonable probability, have entered into the contract or other transaction. (*Wennerholm* v. *Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713, 717 [128 P.2d 522, 141 A.L.R. 1358]; *Spinks* v. *Clark* (1905) 147 Cal. 439, 444 [82 P. 45].) The Church contends that because Molko and Leal learned the Church's true identity prior to becoming formal members, the misrepresentations were "cured" and Molko and Leal could not have justifiably relied on them in deciding to join the Church. (See, e.g., *Neet* v. *Holmes* (1944) 25 Cal.2d 447, 459 [154 P.2d 854] [plaintiff who went ahead with transaction after learning true facts "waived the fraud"].)

Molko and Leal admit they were aware of the Church's identity at the time they formally joined. However, they contend that by the time the Church disclosed its true identity, the Church's agents had rendered them incapable of deciding *not* to join the Church, by subjecting them, without their knowledge or consent, to an intense program of coercive persuasion or

mind control.[10] They contend, in other words, that the Church deceived them into a setting in which they could be "brainwashed," and that the Church could not then "cure" the deception by telling them the truth after their involuntary indoctrination was accomplished.[11] Molko and Leal therefore contend that a triable issue of fact remains as to whether the Church brainwashed them prior to disclosing its identity. If the answer is affirmative, they urge, they have established justifiable reliance.

Although Molko and Leal are far from the first to advance a brainwashing theory in a case involving religious recruitment and indoctrination (see, e.g., *Katz* v. *Superior Court* (1977) 73 Cal.App.3d 952 [141 Cal.Rptr. 234]; *Meroni* v. *Holy Spirit Assn.* (1984) 125 Misc.2d 1061 [480 N.Y.S.2d 706]; *Orlando* v. *Alamo* (8th Cir. 1981) 646 F.2d 1288; *Turner* v. *Unification Church* (1st Cir. 1979) 602 F.2d 458; *Lewis* v. *Holy Spirit Ass'n for Unification* (D.Mass 1983) 589 F.Supp. 10; *Schuppin* v. *Unification Church* (D.Vt. 1977) 435 F.Supp. 603), they are the first to do so in this court. We therefore find it appropriate to briefly review the concept of brainwashing.

■ Brainwashing is "a forcible indoctrination to induce someone to give up basic political, social, or religious beliefs and attitudes and to accept contrasting regimented ideas." (Webster's Ninth New Collegiate Dict. (1987) p. 175.) The specific methods of indoctrination vary, but the basic theory is that brainwashing "is fostered through the creation of a controlled environment that heightens the susceptibility of a subject to suggestion and manipulation through sensory deprivation, physiological depletion, cognitive dissonance, peer pressure, and a clear assertion of authority and dominion. The aftermath of indoctrination is a severe impairment of autonomy and [of] the ability to think independently, which induces a subject's unyielding compliance and the rupture of past connections, affiliations, and associations." (*Peterson* v. *Sorlien* (Minn. 1981) 299 N.W.2d 123, 126 [11 A.L.R.4th 208].)

The brainwashing concept is controversial. Some highly respected authorities conclude brainwashing exists and is remarkably effective. (See, e.g., Lifton, Thought Reform and the Psychology of Totalism (1961); Schein, Coercive Persuasion (1961).) Some commentators additionally conclude that certain religious groups use brainwashing techniques to recruit and

---

[10] We use the terms "coercive persuasion," "mind control," and "brainwashing" interchangeably to refer to the intense indoctrination procedures discussed herein.

[11] The Court of Appeal mischaracterized the fraud claims when it stated that plaintiffs' contention was, "they justifiably relied on representations they *knew to be untrue* because those who made the false representations first stripped [Molko and Leal] of their independent judgment." (Italics added.) The contention is rather that Molko and Leal justifiably relied on representations they *believed* to be true, and as a result were subjected to a process by which they were stripped of their independent judgment.

control members. (See, e.g., Delgado, *Religious Totalism : Gentle and Ungentle Persuasion Under the First Amendment* (1977) 51 So.Cal.L.Rev. 1, 3-9; Rudin & Rudin, Prison or Paradise? The New Religious Cults (1980) pp. 20-25; Clark et al., Destructive Cult Conversion: Theory, Research and Treatment (1979) pp. 1-15.) Courts have recognized the existence of brainwashing in religious settings. (See *Peterson* v. *Sorlien, supra,* 299 N.W.2d at p. 126; *Meroni* v. *Holy Spirit Assn., supra,* 125 Misc.2d 1061, 1067.)

To the contrary, other authorities believe brainwashing either does not exist at all (see Coleman, *New Religions and the Myth of Mind Control* (1984) Am. J. Orthopsychiatry 322, 323) or is effective only when combined with physical abuse or physical restraint (see Scheflin & Opton, The Mind Manipulators (1978) p. 23). We need not resolve the controversy; we need only conclude that the existence of such differing views compels the conclusion that Molko and Leal's theory indeed raises a factual question—viz., whether Molko and Leal were brainwashed—which, if not prohibited by other considerations, precludes a grant of summary judgment for the Church.

## C. *The Singer/Benson Declarations*

In support of their theory, Molko and Leal sought to introduce the declarations of psychologist Dr. Margaret Singer and psychiatrist Dr. Samuel Benson. Both are experts on coercive persuasion and its use by religious groups. Drs. Singer and Benson examined Molko and Leal, and stated in their declarations that they believed the Unification Church's sophisticated indoctrination techniques had rendered Molko and Leal incapable of exercising their own will and judgment, or of responding independently upon learning of their deceptive recruitment.

The trial court and Court of Appeal ruled the Singer and Benson declarations inadmissible on the grounds that (1) the doctors' testimony conflicted with that of Molko and Leal and (2) introducing the declarations would raise inquiries forbidden by the free exercise clause of the First Amendment. We disagree with both conclusions.

The courts below found a conflict between (1) plaintiffs' statements that they joined the Church because it satisfied "personal concerns and anxieties" and (2) Singer's and Benson's statements that it was plaintiffs' unawareness of the Church's identity that caused them to stay. We perceive no such conflict. First, the very theory of coercive persuasion is that it operates, in part, by first amplifying the subject's personal concerns and anxieties and then providing a means of satisfying them. (Schein, Coercive Persuasion, *supra,* at pp. 117-258.) Second, the mere fact that the Church

addressed plaintiffs' personal concerns and anxieties does not conclusively or necessarily establish that Molko and Leal would have chosen to associate with the Church had they known its identity. Thus, viewed in the light most favorable to Molko and Leal, both sets of statements are consistent with the contention that they were deceived into a situation in which they were then brainwashed. Accordingly, the Singer/Benson declarations are not, as the Church argues, made inadmissible by the rule in *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 [112 Cal.Rptr. 786, 520 P.2d 10].

The courts below also held that the Singer and Benson declarations raised questions not allowable under the free exercise clause of the First Amendment to the United States Constitution. We disagree, for reasons we will discuss momentarily.

First, however, we must place the constitutional discussion in the correct perspective. The Court of Appeal declared that Molko and Leal's theory "rest[ed] entirely" on the Singer and Benson declarations. Accordingly, it framed its discussion in terms of whether the declarations' admission would run afoul of the First Amendment. While we reach the same issues under both the federal and state Constitutions, we do so in terms not of the declarations, but of the brainwashing theory itself. Although the Singer and Benson declarations provide a scientific basis for and lend support to plaintiffs' brainwashing theory, we find that the basic theory is amply stated in plaintiffs' own declarations.[12] Therefore, even if arguendo the declarations were correctly excluded,[13] their exclusion does not affect the brainwashing theory for purposes of summary judgment. Molko and Leal have stated an issue of fact; if the issue survives constitutional analysis, it must defeat summary judgment on their actions for fraud.

---

[12] Molko, for example, stated: "I felt my spirit of free will had been broken by [the] total absence of contact with the outside world, the rigid indoctrination program which I was going through daily, and the inability to make any decision on my own." He also stated the Church subjected him to "psychological and emotional manipulation." Leal stated: "While I had no intention of ever becoming a Moonie, in retrospect, I feel that I lost my ability to freely choose whether or not I wished to stay with the group." She also described herself as "pretty thoroughly indoctrinated" by her fourth day at Boonville, and as "robot-like." These statements, from documents incorporated into the pleadings, must be liberally construed for purposes of contesting a motion for summary judgment. (*Gray v. Reeves* (1977) 76 Cal.App.3d 567, 573 [142 Cal.Rptr. 716].) So construed, they amply support Molko and Leal's coercive persuasion theory.

[13] In contending the declarations were properly excluded, the Church offers several arguments it did not raise in the Court of Appeal, and which we therefore do not reach. (Cal. Rules of Court, rule 29(b).)

D. *Constitutional Issues*

1. *Applicable Principles*

The First Amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." The provision creates two very different protections. The "establishment clause" guarantees the government will not impose religion on us; the "free exercise" clause guarantees the government will not prevent us from freely pursuing any religion we choose.

Because the First Amendment refers only to Congress, it originally did not apply to state and local governments. (See, e.g., *Permoli* v. *New Orleans* (1845) 44 U.S. (3 How.) 589, 610 [11 L.Ed. 739, 748-749] [upholding conviction of Catholic priest for violating ordinance against exposing corpses to public view when he blessed the deceased at a funeral mass].) After the Civil War the states ratified the Fourteenth Amendment, and pursuant thereto the Supreme Court made the free exercise and establishment clauses federally enforceable against the states. (*Everson* v. *Board of Education* (1947) 330 U.S. 1, 8 [91 L.Ed.2d 711, 719-720, 67 S.Ct. 504, 168 A.L.R. 1392]; *Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1352].)

California guarantees free exercise and disestablishment in the state Constitution. (Cal. Const., art. I, § 4.)

■ The religion clauses protect only claims rooted in religious belief. (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 215 [32 L.Ed.2d 15, 25, 92 S.Ct. 1526].) The free exercise clause protects religious beliefs absolutely. (*Cantwell* v. *Connecticut, supra,* 310 U.S. at pp. 303-304 [84 L.Ed.2d at pp. 1217-1218].) While a court can inquire into the *sincerity* of a person's beliefs, it may not judge the truth or falsity of those beliefs. (*United States* v. *Ballard* (1944) 322 U.S. 78, 86-88 [88 L.Ed. 1148, 1153-1155, 64 S.Ct. 882].) The government may neither compel affirmation of a religious belief (*Torcaso* v. *Watkins* (1961) 367 U.S. 488, 495 [6 L.Ed.2d 982, 987, 81 S.Ct. 1680]), nor penalize or discriminate against individuals or groups because of their religious beliefs (*Fowler* v. *Rhode Island* (1953) 345 U.S. 67, 70 [97 L.Ed. 828, 831, 73 S.Ct. 526]), nor use the taxing power to inhibit the dissemination of particular religious views (*Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 116 [87 L.Ed. 1292, 1300, 63 S.Ct. 870, 146 A.L.R. 81]).

■ However, while religious *belief* is absolutely protected, religiously motivated *conduct* is not. (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 402-403

[10 L.Ed.2d 965, 969-970, 83 S.Ct. 1790]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718 [40 Cal.Rptr. 69, 394 P.2d 813].) Such conduct "remains subject to regulation for the protection of society." (*Cantwell* v. *Connecticut, supra,* 310 U.S. at p. 304 [84 L.Ed. at p. 1218].) Government action burdening religious conduct is subject to a balancing test, in which the importance of the state's interest is weighed against the severity of the burden imposed on religion. (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 214 [32 L.Ed.2d at p. 24].) The greater the burden imposed on religion, the more compelling must be the government interest at stake. (Compare *Wisconsin* v. *Yoder, supra,* 406 U.S. at pp. 221-235 [32 L.Ed.2d at pp. 34-36] [government's strong interest in educating citizens insufficient to justify educational requirement that threatened continued survival of Old Order Amish communities], with *Goldman* v. *Weinberger* (1986) 475 U.S. 503, 508 [89 L.Ed.2d 478, 484-485, 106 S.Ct. 1310] [government's reasonable interest in uniform military attire sufficient to justify mild burden on religious expression created by ban against Jewish officer wearing a yarmulke].) A government action that passes the balancing test must also meet the further requirements that (1) no action imposing a lesser burden on religion would satisfy the government's interest and (2) the action does not discriminate between religions, or between religion and nonreligion. (*Braunfield* v. *Brown* (1961) 366 U.S. 599, 607 [6 L.Ed.2d 563, 568-569, 81 S.Ct. 1144].)

Applying these criteria, the Supreme Court has allowed some religious conduct to be banned entirely (see, e.g., *Reynolds* v. *United States* (1878) 98 U.S. 145, 166 [25 L.Ed. 244, 250] [upholding law against polygamy]; *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 170-171 [88 L.Ed. 645, 654-655, 64 S.Ct. 438] [permitting state to prohibit parents from allowing their children to distribute religious literature when necessary to protect children's health and safety]), and some conduct to be compelled in the face of religious objections (see, e.g., *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11, 38 [49 L.Ed. 643, 654-655, 25 S.Ct. 358] [upholding compulsory vaccinations for communicable diseases]; *United States* v. *Lee* (1982) 455 U.S. 252, 261 [71 L.Ed.2d 127, 134-135, 102 S.Ct. 1051] [upholding mandatory participation of Amish in Social Security system]).

Other religious conduct, though not banned, has been restricted. (See, e.g., *Heffron* v. *International Society for Krishna Consciousness, Inc.* (1981) 452 U.S. 640, 654 [69 L.Ed.2d 298, 310-311, 101 S.Ct. 2559] [upholding law restricting sale and distribution of literature and soliciting of funds at state fair to booths at specified locations]; *Cox* v. *New Hampshire* (1941) 312 U.S. 569, 575 [85 L.Ed. 1049, 1053, 61 S.Ct. 762] [upholding license requirement for religious parades].) Still other religious conduct, though not banned or restricted, has been made more costly. (See, e.g., *Braunfield* v. *Brown, supra,* 366 U.S. 599, 605 [6 L.Ed.2d 563, 567-568] [upholding Sunday

closing law in spite of financial burden on Orthodox Jew who must refrain from working Saturday as well]; *Bob Jones University* v. *United States* (1983) 461 U.S. 574, 604 [76 L.Ed.2d 157, 181, 103 S.Ct. 2017] [upholding denial of tax-exempt status to private school practicing religiously motivated racial discrimination]; *Tony and Susan Alamo Foundation* v. *Secty. of Labor* (1985) 471 U.S. 290, 305 [85 L.Ed.2d 278, 290-291, 105 S.Ct. 1953] [holding minimum wage laws applicable to religious groups].)

██ While judicial sanctioning of tort recovery constitutes state action sufficient to invoke the same constitutional protections applicable to statutes and other legislative actions.(*New York Times* v. *Sullivan* (1964) 376 U.S. 254, 265 [11 L.Ed.2d 686, 697-698, 84 S.Ct. 710, 95 A.L.R.2d 1412]), religious groups are not immune from all tort liability. It is well settled, for example, that religious groups may be held liable in tort for secular acts. (See, e.g., *Malloy* v. *Fong* (1951) 37 Cal.2d 356, 372 [232 P.2d 241] [religious corporation liable for negligent driving by employee].) Most relevant here, in appropriate cases courts will recognize tort liability even for acts that are religiously motivated. (See, e.g., *O'Moore* v. *Driscoll* (1933) 135 Cal.App. 770, 778 [28 P.2d 438] [allowing priest's action against his superiors for false imprisonment as part of their effort to obtain his confession of sins]; *Bear* v. *Reformed Mennonite Church* (1975) 462 Pa. 330 [341 A.2d 105, 107] [allowing action for interference with marriage and business interests when church ordered congregation to "shun" former member]; *Carrieri* v. *Bush* (1966) 69 Wn.2d 536 [419 P.2d 132, 137] [allowing action for alienation of affections when pastor counselled woman to leave husband who was "full of the devil"]; *Candy H.* v. *Redemption Ranch, Inc.* (M.D.Ala. 1983) 563 F.Supp. 505, 516 [allowing action for false imprisonment against religious group]; *Van Schaick* v. *Church of Scientology of Cal., Inc.* (D.Mass. 1982) 535 F.Supp. 1125, 1135 ["[c]auses of action based upon some proscribed conduct may, thus, withstand a motion to dismiss even if the alleged wrongdoer acts upon a religious belief or is organized for a religious purpose"].)

2. *Constitutional Analysis of the Fraud Claim*

██ While the Unification Church's standing as a church is not at issue,[14] Molko and Leal contend the Church's misrepresentations were "entirely secular" and therefore not protected by the religion clauses. We disagree. Molko and Leal themselves claim the Church made its misrepresentations because of a belief in what they describe as "Heavenly Deception." Accord-

---

[14] Although he did not contest the Church's religious standing in the Court of Appeal, Molko now seeks to argue, in substance, that the Unification Church is not a bona fide religion because it is "dishonest." He may not raise this doubtful contention for the first time here. (Cal. Rules of Court, rule 29(b).)

ing to Molko and Leal, that doctrine holds, in essence, that it is acceptable to lie to someone in order to give him the opportunity to hear Reverend Moon's teachings.[15] As alleged by the plaintiffs, the Church's deceptions, although secular on the surface, are clearly "rooted in religious belief." (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 215 [32 L.Ed.2d at p. 25].) While this does not mean such Church misrepresentations are immune from government regulation, it does mean any such regulation must survive constitutional scrutiny.

Preliminarily, we note Molko and Leal do not contest the *sincerity* of what they understand to be the Church's beliefs; indeed, as just stated, they assert the Church's deceptions were the product of sincerely held beliefs. ▪ Our initial inquiry, then, is whether plaintiffs' actions for fraud implicate religious *belief* or religiously motivated *conduct*. If the former, the actions are barred. (*Sherbert* v. *Verner, supra,* 374 U.S. at pp. 402-403 [10 L.Ed.2d at pp. 969-970].) If the latter, further constitutional analysis is necessary.

Molko and Leal claim they do not challenge the truth or falsity of the Church's beliefs; they contend rather that they challenge only the Church's fraudulent conduct in implementing those beliefs. The Court of Appeal disagreed, reasoning that it would be impossible to consider Molko and Leal's theory "without questioning the authenticity and force of the Unification Church's religious teachings and permitting a jury to do likewise, which is constitutionally forbidden." The court relied on *Katz* v. *Superior Court, supra,* 73 Cal.App.3d 952, in reaching its conclusion, and the Church adopts this view. We therefore examine *Katz* to determine whether such reliance was properly placed.

Like the present case, *Katz* involved allegations of brainwashing against the Unification Church. The plaintiffs in *Katz,* however, were not former Church members but parents of current Church members. Claiming their adult children had been brainwashed, the parents sought and received orders from the superior court appointing them temporary conservators of the persons of their children. The parents' objective was to have their children deprogrammed and their children's association with the Unification Church terminated.

The Court of Appeal in *Katz* overturned the conservatorship orders, holding that in the absence of actions rendering the adult believers "gravely disabled," the processes of the state could not "be used to deprive the believer of his freedom of action and to subject him to involuntary treat-

---

[15] At oral argument, the Church disavowed any such belief.

ment." (73 Cal.App.3d at pp. 988-989.) The court declared the conservatorship orders violated the Church members' free exercise rights because the orders were based on a judgment regarding the truth or falsity of their beliefs. (*Id*. at p. 987.) Likening the Church members' radical changes of lifestyle to the refusal of the Amish in *Yoder* to send their children to high school, the court found the situation one in which conduct could not be separated from beliefs. (*Ibid*.) It queried "When the court is asked to determine whether that change [in lifestyle] was induced by faith or by coercive persuasion is it not in turn investigating and questioning the validity of that faith?" (*Ibid*.)

The *Katz* court, of course, faced circumstances substantially different from those before us. The conservatorship orders, if allowed to stand, would have directly and severely burdened the Church members' absolute right to believe in the teachings of the Unification Church. Not only would the orders have allowed the parents to remove their adult children from the religious community they claimed to desire; the orders would have further allowed the parents to subject those individuals, against their will, to a program specifically intended to eradicate their current religious beliefs. Thus, the *Katz* court was correct—as in *Yoder,* the burden on the Church members' conduct was inseparable from the burden on their beliefs.

In sharp contrast, liability for fraud in the case at bar would burden no one's right to believe and no one's right to remain part of his religious community, nor would it subject anyone to involuntary deprogramming: the plaintiffs here are the former Church members themselves. It might, of course, somewhat burden the Church's efforts to recruit new members by deceptive means.

The *Katz* court also faced a legal question markedly different from that now posed: it considered whether a court could determine if an asserted religious conversion "was induced by faith or by coercive persuasion." (*Katz* v. *Superior Court, supra,* 73 Cal.App.3d at p. 987.) In other words, the *Katz* court had to decide whether a court could "question the validity" of a person's stated faith because someone *else* claimed that person was brainwashed. (*Ibid*.)

Again in contrast, the legal question here does *not* require a court to determine whether anyone's faith, current *or* past, is or was real. As stated above, Molko and Leal do not question the Church's beliefs. Neither do they challenge the "validity" of their former faith; they state quite plainly that their erstwhile beliefs in the Unification Church were sincere. The legal question is simply whether a religious organization can be held liable on a

traditional cause of action in fraud for deceiving nonmembers into subjecting themselves, without their knowledge or consent, to coercive persuasion.

The Court of Appeal held that although *Katz* was different in certain ways, its analysis compelled the conclusion that to consider plaintiffs' fraud claims would require "questioning the authenticity and the force" of the Church's teachings. We disagree. The challenge here, as we have stated, is not to the Church's teachings or to the validity of a religious conversion. The challenge is to the Church's practice of misrepresenting or concealing its identity in order to bring unsuspecting outsiders into its highly structured environment. That practice is not itself *belief*—it is *conduct* "subject to regulation for the protection of society." (*Cantwell* v. *Connecticut, supra,* 310 U.S. at p. 304 [84 L.Ed.2d at p. 1218].)

 Our next inquiry, then, is whether the state's interest in allowing tort liability for the Church's deceptive practices is important enough to outweigh any burden such liability would impose on the Church's religious conduct. (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 221 [32 L.Ed.2d at pp. 28-29].)

We turn first to the question whether tort liability for fraudulent recruiting practices imposes any burden on the free exercise of the Unification Church's religion. We think it does. While such liability does not impair the Church's right to believe in recruiting through deception, its very purpose is to discourage the Church from putting such belief into practice by subjecting the Church to possible monetary loss for doing so. Further, liability presumably impairs the Church's ability to convert nonbelievers, because some potential members who would have been recruited by deception will choose not to associate with the Church when they are told its true identity.

Yet these burdens, while real, are not substantial. Being subject to liability for fraud does not in any way or degree prevent or inhibit Church members from operating their religious communities, worshipping as they see fit, freely associating with one another, selling or distributing literature, proselytizing on the street, soliciting funds, or generally spreading Reverend Moon's message among the population. It certainly does not, like the educational requirement in *Yoder,* compel Church members to perform acts "at odds with fundamental tenets of their religious beliefs." (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 218 [32 L.Ed.2d at p. 26].) At most, it potentially closes one questionable avenue for bringing new members into the Church.

We must next consider whether a compelling state interest justifies the marginal burden such liability imposes on the Church's free exercise rights. We have no difficulty in finding such an interest in the "substantial threat to

public safety, peace or order" the Church's allegedly fraudulent conduct poses. (*Sherbert* v. *Verner, supra,* 374 U.S. at p. 403 [10 L.Ed.2d at p. 970].) For it is one thing when a person knowingly and voluntarily submits to a process involving coercive influence, as a novice does on entering a monastery or a seminary. (See Schein, Coercive Persuasion (1961) p. 272.) But it is quite another when a person is subjected to coercive persuasion without his knowledge or consent. While some individuals who experience coercive persuasion emerge unscathed, many others develop serious and sometimes irreversible physical and psychiatric disorders, up to and including schizophrenia, self-mutilation, and suicide. (See generally Delgado, *Religious Totalism: Gentle and Ungentle Persuasion Under the First Amendment, supra,* 51 So.Cal.L.Rev. 1, 10-25, and sources cited therein.) The state clearly has a compelling interest in preventing its citizens from being deceived into submitting unknowingly to such a potentially dangerous process.

The state has an equally compelling interest in protecting the family institution. (See, e.g., *Reynolds* v. *United States, supra,* 98 U.S. 145, 165-166 [25 L.Ed. 244, 250]; *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399-403 [67 L.Ed. 1042, 1045-1047, 43 S.Ct. 625, 29 A.L.R. 1446]; *Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 534-535 [69 L.Ed. 1070, 1077-1078, 45 S.Ct. 571, 39 A.L.R. 468]; *Moore* v. *City of East Cleveland* (1977) 431 U.S. 494, 503-504 [52 L.Ed.2d 531, 539-541, 97 S.Ct. 1932] [plur. opn.].) Since the family almost invariably suffers great stress and sometimes incurs significant financial loss when one of its members is unknowingly subjected to coercive persuasion (Enroth, Youth, Brainwashing, and the Extremist Cults (1977) pp. 199-201), the state has a compelling interest in protecting families from suffering such impairments as a result of fraud and deception.

We conclude, therefore, that although liability for deceptive recruitment practices imposes a marginal burden on the Church's free exercise of religion, the burden is justified by the compelling state interest in protecting individuals and families from the substantial threat to public safety, peace and order posed by the fraudulent induction of unconsenting individuals into an atmosphere of coercive persuasion.

Our analysis cannot end here, however. ■■■ A government action burdening free exercise, even though justified by a compelling state interest, is impermissible if any action imposing a lesser burden on religion would satisfy that interest. (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 718 [67 L.Ed.2d 624, 634, 101 S.Ct. 1425]; *Sherbert* v. *Verner, supra,* 374 U.S. at p. 406 [10 L.Ed.2d at pp. 971-972]; *Braunfield* v. *Brown, supra,* 366 U.S. at p. 607 [6 L.Ed.2d at pp. 568-569].) ■■■ After careful consideration, we perceive no such less restrictive alternative available. It has been suggested, for example, that brainwashing be criminalized.

(Lucksted & Martell, *Cults: A Conflict Between Religious Liberty and Involuntary Servitude?* (June 1982) F.B.I. Law Enforcement Bull. at p. 21.) This approach, which would invoke the coercive power of the state and could result in the jailing of church members, would clearly impose a greater burden on religion than would civil tort liability for fraud. It has also been suggested that the law should authorize involuntary deprogramming of brainwashed individuals by their friends or families. (Aronin, *Cults, Deprogramming, and Guardianship: A Model Legislative Proposal* (1982) 17 Colum. J.L. & Soc. Probs. 163, 183-216.) But the potentially severe burdens on religion inherent in this approach are evident from our discussion of *Katz, supra.* Lastly, it has been proposed that proselytizers be required to obtain informed consent prior to attempting to initiate religious conversions. (Delgado, *Cults and Conversion: The Case for Informed Consent* (1982) 16 Ga. L.Rev. 533, 537-540.) To the extent such an approach would require the active dissemination of specific information about a religion's nature, activities and lifestyle, however, it would also burden religion to a greater extent than would simple passive liability for fraud. In short, it appears that to allow injured parties to bring private actions for fraud is the least restrictive means available for advancing the state's interest in protecting individuals and families from the harmful effects of fraudulent recruitment.

■■■ Finally, even though the state action is justified by a compelling state interest and imposes the minimum burden required to satisfy that interest, it can be upheld only if it (1) has the purpose and effect of advancing the state's secular goals and (2) does not discriminate between religions, or between religion and nonreligion. (*Braunfield* v. *Brown, supra,* 366 U.S. at p. 607 [6 L.Ed.2d at pp. 568-569].) ■■■ We find that judicial sanctioning of traditional tort liability for fraudulent recruitment satisfies these standards. First, its purpose and effect is plainly to advance the legitimate secular goal of protecting persons from being harmed by fraud. Second, it is nondiscriminatory: all organizations, religious or otherwise, may be held liable for damages caused by their fraudulent acts. Were a nonreligious organization—e.g., a group espousing a political or social cause—to deceive a person into unknowingly submitting to coercive persuasion, the same liability would ensue.

■■■ We conclude that neither the federal nor state Constitution bars Molko and Leal from bringing traditional fraud actions against the Church for allegedly inducing them, by misrepresentation and concealment of its identity, into unknowingly entering an atmosphere in which they were then subjected to coercive persuasion. Because triable issues of fact exist as to (1) whether the forms Molko and Leal signed before going to Boonville put them on notice regarding the Church's identity and (2) whether Molko and

Leal were, by means of coercive persuasion, rendered unable to respond independently upon learning they had been deceived, we hold that the Court of Appeal erred in affirming the summary judgment for the Church as to plaintiffs' actions for fraud.

### III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A. *Nature of the Claim*

The elements of a cause of action for intentional infliction of emotional distress are (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress. (*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 155, fn. 7 [233 Cal.Rptr. 308, 729 P.2d 743].) Molko and Leal contend the Church's fraudulent and coercive conduct was outrageous, was carried out with reckless disregard of the probability of causing them emotional distress, and was the actual and proximate cause of their severe emotional suffering.

The Court of Appeal found in part that threats of divine retribution, of which Molko and Leal complained, were protected religious speech and could not form the basis of a claim of intentional infliction of emotional distress. We agree with this view. To the extent the claims are based merely on threats of divine retribution if Molko and Leal left the church, they cannot stand. (See *Fowler* v. *Rhode Island, supra,* 345 U.S. at p. 70 [97 L.Ed. at p. 831] [court cannot regulate or control sermons]; *Van Schaick* v. *Church of Scientology of Cal., Inc., supra,* 535 F.Supp. at p. 1139.)

However, the claims do not rest solely or even primarily on threats of divine retribution. Molko and Leal essentially contend the same conduct that supports their fraud actions—i.e., misrepresentation and concealment of the Church's identity for the purpose of inducing them to submit unknowingly to coercive persuasion—also gives rise to an action for intentional infliction of emotional distress. The Court of Appeal, having found the fraud theory constitutionally impermissible, naturally found the same theory could not constitutionally provide the basis for a different cause of action. Proceeding on the assumption that Molko and Leal had freely joined the Church, the court went on to find the Church's conduct could not be considered "extreme and outrageous" in the sense required to support an action for emotional distress.

Since we have determined that Molko and Leal's fraud theory *is* constitutionally permissible, we must consider whether the Church's conduct under

that theory also gives rise to an action for intentional infliction of emotional distress. First, however, we consider two contentions raised by the Church.

## B. *The Church's Preliminary Arguments*

■ The Church initially contends that all the misrepresentations of which Molko and Leal complain are privileged under Civil Code section 47 as "communication[s] without malice, to a person interested therein, . . . by one who is also interested . . . ." The point is without merit. Molko and Leal concede that the misrepresentations were communications, and that the Church's intent to recruit Molko and Leal did not reflect a "state of mind arising from hatred or ill will," as required for a showing of malice. (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 944 [160 Cal.Rptr. 141, 603 P.2d 58].) However, they correctly urge that the communications cannot be said to have been from one "interested" party to another. The Church relies on *Brewer* v. *Baptist Church* (1948) 32 Cal.2d 791 [197 P.2d 713], to establish that Molko and Leal were interested parties. But *Brewer* holds that "the common interest of the *members* of a church in church matters is sufficient to give rise to a qualified privilege to communication *between members* on subjects relating to the church's interests." (*Id.* at p. 796, italics added.) Here the Church has vigorously taken the position that Molko and Leal did not become Church members until after *learning* of the deceptions. It cannot now inconsistently claim a privilege on the theory that Molko and Leal were members at the time the deceptions occurred.

The Church also contends that a statement by Leal in her deposition that certain of her harms were "self-inflicted" constitutes an admission of consent and therefore provides a complete defense to liability under Civil Code section 3515. This argument is also without merit. Leal's statement relates to her final few weeks with the Church, during which she sold flowers on the streets of Los Angeles from 7 a.m. until midnight for 19 of 20 consecutive days. Leal said the physical harms she experienced were self-inflicted because she was obeying the Church's doctrine of suffering to "pay indemnity" to God. Viewed in the light most favorable to Leal, as it must be on motion for summary judgment, her statement reflects not consent but mere submission. In any event, since the statement relates to a period of time considerably later than that during which the alleged fraud and brainwashing occurred, it cannot provide a defense to the present action.

## C. *Analysis of the Claim*

We begin by observing that the Church does not attempt to negate (1) its intention to cause, or its reckless disregard of the probability of causing, emotional distress, (2) plaintiffs' severe emotional suffering, or (3) its

conduct's actual and proximate causation of that suffering. Because the Church must conclusively negate at least one necessary element of this cause of action to be entitled to summary judgment (*Stationers Corp.* v. *Dun & Bradstreet, supra,* 62 Cal.2d at p. 417), the propriety of the summary judgment depends on whether the Church can establish as a matter of law that its conduct, even under Molko and Leal's theory, was not "extreme and outrageous" in the sense required to support an action for emotional distress.

 Conduct is extreme and outrageous when it " ' "exceeds all bounds [of decency] usually tolerated by a decent society, [and is] of a nature which is especially calculated to cause, and does cause, mental distress. . . ." ' " (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 155, fn. 7.) Liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Rest.2d Torts, § 46, com. d.) " ' ". . . Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress . . . ." ' " (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 155, fn. 7.)

 The Church offers two arguments why its conduct was not, as a matter of law, extreme and outrageous. First it contends its actions amounted to nothing more than "intensive religious practice," and therefore were different only in degree, not in kind, from those of many other religious groups. We find this claim unconvincing. Although fasting, poverty, silence or cloistered living may constitute intensive religious practice, we have already determined that fraud, even though purported to be religiously motivated, is actionable conduct under the circumstances presented here.

Second, as mentioned above, the Church argues that Leal's long hours of work were "self-inflicted." It contends its encouragement for her to sell flowers and solicit money does not constitute outrageous conduct. But since the conduct that the Church relies on occurred after Leal had formally joined the Church, the argument has no bearing on whether its original fraudulent inducement into an atmosphere of coercive persuasion—the conduct at issue—is extreme and outrageous.

Viewed in the light most favorable to plaintiffs, the Church's continued deceptions might well be seen as conduct breaching plaintiffs' trust in the integrity of those who were promising to make their lives more meaningful. So viewed, the Church's actions might well constitute an abuse of "a relation or position which gives [the Church] power to damage the plaintiff's

interest." (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 155, fn. 7.)

" 'Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.' " (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499 [86 Cal.Rptr. 88, 468 P.2d 216].) Since reasonable persons could differ here, a question of fact remains as to whether the Church's conduct was outrageous for purposes of this action. It follows that the Court of Appeal erred in affirming the summary judgment for the Church as to plaintiffs' actions for intentional infliction of emotional distress.

## IV. FALSE IMPRISONMENT

False imprisonment is "the unlawful violation of the personal liberty of another." (Pen. Code, § 236; see *Parrott* v. *Bank of America* (1950) 97 Cal.App.2d 14, 22 [217 P.2d 89, 35 A.L.R.2d 263] [definition of crime and tort the same].) ■ "The tort of false imprisonment is the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." (*City of Newport Beach* v. *Sasse* (1970) 9 Cal.App.3d 803, 810 [88 Cal.Rptr. 476].) A person is falsely imprisoned "if he is wrongfully deprived of his freedom to leave a particular place by the conduct of another." (*Schanafelt* v. *Seaboard Finance Co.* (1951) 108 Cal.App.2d 420, 422-423 [239 P.2d 42].)

■ Leal contends she was falsely imprisoned by the Church at Boonville, at Camp K, at Boulder, at Los Angeles, and at various locations in San Francisco.[16] She admits she was theoretically free to depart at any time; she was not physically restrained, subjected to threats of physical force, or subjectively afraid of physical force. She insists, however, that her "imprisonment arose from the harm she came to believe would result if she left the community." That harm, specifically, was that her family "would be damned in Hell forever and they would forever feel sorry for having blown their one chance to unite with the Messiah and make it to Heaven."

The claim cannot survive constitutional scrutiny. Although Leal correctly asserts that false imprisonment may be "effected by . . . fraud or deceit" (Pen. Code, § 237), her theory implicates the Church's beliefs: it plainly seeks to make the Church liable for threatening divine retribution. As we stated earlier, such threats are protected religious speech (see *Fowler* v.

---

[16] Although Molko also alleged a cause of action for false imprisonment, he has chosen not to contest the Court of Appeal's affirmance of summary judgment for the Church on that action.

*Rhode Island, supra,* 345 U.S. at p. 70 [97 L.Ed. at p. 831]; *Van Schaick* v. *Church of Scientology of Cal., Inc., supra,* 535 F.Supp. at p. 1139) and cannot provide the basis for tort liability. Accordingly, we hold the Court of Appeal correctly affirmed the summary judgment for the Church as to Leal's action for false imprisonment.

## V. RESTITUTION

 Molko seeks restitution of his $6,000 gift to the Church. His claim arises directly out of his fraud theory: he asserts that the Church deceived him into unknowingly submitting to coercive persuasion, thereby obtaining undue influence over him which it later used to extract the gift.

The Court of Appeal held that Molko could not challenge the validity of the gift without challenging the validity of his former beliefs, which is constitutionally forbidden. We disagree.[17] Molko's assertion is a natural extension of his fraud theory: he contends, in effect, that one of his damages from the fraud was the $6,000 loss.

Undue influence is "the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him." (Civ. Code, § 1575.) Stated another way, undue influence is " 'that kind of influence or *supremacy of one mind over another* by which that other is prevented from acting according to his own wish or judgment' " (*Bolander* v. *Thompson* (1943) 57 Cal.App.2d 444, 448 [134 P.2d 924], italics added); it occurs when "one party uses [its] dominant psychological position in an unfair manner to induce the subservient party to consent to an agreement to which he would not otherwise have consented" (Calamari & Perillo, The Law of Contracts (2d ed. 1977) pp. 274-275).

---

[17] Although circumstances sufficient to support such a claim occur infrequently, religiously motivated gifts have occasionally been set aside on a particularly strong showing of undue influence by religious advisors. (See, e.g., *Estate of Bourquin* (1958) 161 Cal.App.2d 289, 299-300 [326 P.2d 604] [will leaving bulk of estate to a church rest home was the result of undue influence of rest home employees, who held confidential relationship with testator as religious advisors].)

The Court of Appeal cited *Estate of Supple* (1966) 247 Cal.App.2d 410, 414-415 [55 Cal.Rptr. 542], to support its position. *Supple,* however, was not an undue influence case. In *Supple,* a lifelong church member left a portion of his estate to various church charities with which he had a longstanding association. His grandnephew challenged the will on the sole ground that the church's teachings were false, and hence the testator was in that sense tricked into leaving part of his estate to the church. (*Id.* at p. 412.) Such a direct attack on the truth or falsity of religious beliefs was clearly prohibited by the First Amendment. (*United States* v. *Ballard, supra,* 322 U.S. at pp. 86-88 [88 L.Ed. at pp. 1153-1155].) However, as we explained above in distinguishing *Katz* v. *Superior Court, supra,* 73 Cal.App.3d 952, Molko does not challenge the validity of his former beliefs. Therefore *Supple* is inapplicable.

We have already concluded, in the context of Molko's fraud claim, that a triable issue of fact exists as to whether Molko lost his ability to make independent decisions as a result of being deceived into submitting unknowingly to coercive persuasion. It would be odd indeed, then, if we did not find that a triable issue of fact exists as to whether, by means of the alleged deception, the Church established and used its dominant psychological position and its confidential relationship with Molko "for the purpose of obtaining unfair advantage over him" with regard to his $6,000 gift.

We do so find, and accordingly hold that the Court of Appeal erred in affirming the summary judgment for the Church as to Molko's claim for restitution.[18]

## VI. The Church's Cross-complaint Against Maxwell

The Church alleged that Maxwell's deprogramming activities violated the federal and state civil rights of the Church and its members. (42 U.S.C. § 1985(3) [hereafter section 1985(3)]; Civ. Code, §§ 51.7, 52.) It also asserted a cause of action against Maxwell for full or partial indemnity, on the theory that he, by kidnapping and deprogramming Molko, had wholly or partially caused any damages for which the Church might be held liable to Molko.

The trial court sustained without leave to amend Maxwell's demurrers to all three causes of action, and entered judgments of dismissal for him. The Court of Appeal reversed the judgments of dismissal on the state and federal civil rights causes of action, holding that the court abused its discretion by refusing leave to amend the complaint. Because it affirmed the summary judgment for the Church in the action by Molko and Leal, it did not review the dismissal of the Church's cause of action for indemnity.

### A. *The Federal Claim*[19]

The Church alleged that Maxwell conspired with others to deprive it and its members of equal protection of the laws and of "equal privileges and immunities under the laws." It contended Maxwell's purpose was, inter alia, to prevent Church members from freely exercising their religious beliefs through interstate travel. The Church sought injunctive relief as well as

---

[18] Accordingly, we need not consider Molko's invitation to adopt the views of the Nebraska and Rhode Island supreme courts that gifts to religious leaders or advisors are *presumptively* made under undue influence. (See *Guill* v. *Wolper* (1974) 235 191 Neb. 805 [218 N.W.2d 224, 235]; *Nelson* v. *Dodge* (1949) 76 R.I. 1 [68 A.2d 51, 55].)

[19] In this court Maxwell does not challenge the decision of the Court of Appeal as to the Church's claim under state civil rights law.

compensatory and punitive damages. In its appeal to the Court of Appeal it abandoned its contention that it could assert free exercise claims under section 1985(3), but continued to assert it had representational standing to sue for a violation of its members' constitutionally guaranteed right to travel. (*Zobel* v. *Williams* (1982) 457 U.S. 55 [72 L.Ed.2d 672, 102 S.Ct. 2309].) The Court of Appeal agreed and reversed the dismissal on that ground.

Maxwell offers three arguments why his demurrer to the Church's federal claim was properly sustained. As will appear, none is persuasive. First, he contends the Church failed to meet the second of three requirements for representational standing set forth in *Hunt* v. *Washington Apple Advertising Comm'n* (1977) 432 U.S. 333, 343 [53 L.Ed.2d 383, 394, 97 S.Ct. 2434]. The requirement in question is that "the interests [that the organization] seeks to protect are germane to the organization's purpose." (*Ibid.*) Maxwell asks us to infer from that requirement a test of the Church's status as a bona fide religious organization: apparently he wishes to argue that the Church is a political rather than religious organization, and that its members' right to travel is somehow not germane to the organization's true purpose. But the contention has no support in the law, and we decline to adopt such a novel reading of a federal statute.

Second, Maxwell contends his demurrer was properly sustained because a conspiracy to infringe First Amendment rights does not violate section 1985(3) unless either a state is involved in the conspiracy or the conspiracy aims to influence the state's activity. While the contention correctly states the Supreme Court's holding in *Carpenters* v. *Scott* (1983) 463 U.S. 825, 830 [77 L.Ed.2d 1049, 1055, 103 S.Ct. 3352], it overlooks the court's further statement in *Carpenters* that in accordance with *Griffin* v. *Breckenridge* (1971) 403 U.S. 88 [29 L.Ed.2d 338, 91 S.Ct. 1790], section 1985(3) *does* reach purely private conspiracies aimed at depriving persons of the constitutionally guaranteed right to travel. (*Carpenters* v. *Scott, supra,* 463 U.S. at pp. 832-833 [77 L.Ed.2d at pp. 1056-1057].) The Church alleges just such a conspiracy here.[20]

Third, Maxwell contends the Church's federal cause of action was barred by the state statute of limitations because it was subject to the one-year

---

[20]The *Carpenters* court declined to pass on whether section 1985(3) reaches conspiracies other than those motivated by racial bias. (463 U.S. at p. 835 [77 L.Ed.2d at p. 1058].) The Fourth Circuit, however, noting that "the lower federal courts have, almost without exception, extended the coverage of the statute to religious groups [citations]," has expressly held that a conspiracy against the Unification Church motivated by religious discrimination falls within the ambit of section 1985(3). (*Ward* v. *Connor* (4th Cir. 1981) 657 F.2d 45, 48; see generally Annot., Civil Liability for "Deprogramming" Member of Religious Sect (1982) 11 A.L.R.4th 228.) As Maxwell does not contest the Church's claim on this basis, we need not address this question of federal law.

limitation period for personal injury claims set forth in Code of Civil Procedure section 340, subdivision (2). However, as the Court of Appeal correctly held, the Church seeks to amend its complaint to seek injunctive relief only as to what it alleges to be an ongoing conspiracy among Maxwell and the other cross-defendants. The statute of limitations does not begin to run in civil conspiracy cases until the last overt act of the conspiracy has been completed. (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 787 [157 Cal.Rptr. 392, 598 P.2d 45].) Thus, if a continuing conspiracy is proved, the action is obviously timely; if no conspiracy is proved, injunctive relief will be denied. The determinative issue is factual and cannot be resolved by demurrer.

## B. *Indemnification*

As stated above, the trial court sustained Maxwell's demurrer to the Church's cause of action for indemnification, and entered a judgment of dismissal; the Court of Appeal, because it affirmed the summary judgment for the Church in plaintiffs' action for damages, did not address any of the issues raised in the Church's appeal from the judgment of dismissal. Because we reverse the summary judgment on the merits, however, those issues are no longer moot.

The Church bases its indemnification action on the theory that Maxwell, by kidnapping and deprogramming Molko, wholly or partially caused any damages for which the Church might be held liable to Molko. The Church contends, in other words, that if it is held liable to Molko as an intentional tortfeasor, it should be allowed to seek indemnification from Maxwell as a concurrent intentional tortfeasor.

Thus the Church asks us to consider an issue of first impression—whether the equitable indemnity doctrine, as set forth by this court in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], permits an intentional tortfeasor to obtain indemnity from concurrent intentional tortfeasors on a comparative fault basis. We must decline the invitation, however, because the facts in the present case would not support such an action even if it were otherwise permitted.

■ It is not sufficient, for purposes of indemnification, for a defendant simply to claim someone else caused all or part of the plaintiff's damages. To state a claim for indemnification, a defendant must allege that the same harm for which he may be held liable is properly attributable—at least in part—to the alleged indemnitor. (See, e.g., Rest.2d Torts, § 886B, subd. (1): "If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other . . . .") If a defendant believes the plaintiff's injuries were the

result of a different harm altogether, he may argue the point to the jury and escape liability if successful. Absent some claim of mutual liability for the same harm, however—under joint-and-several or vicarious liability principles, for example—an indemnification action will not lie. (See *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578 at p. 606 ["[W]e think it only fair that a defendant who may be jointly and severally liable for all of the plaintiff's damages be permitted to bring other concurrent tortfeasors into the suit."].)

The Church claims not that Maxwell shares responsibility for any harm the Church caused Molko through its alleged deception and coercive persuasion, but rather that Maxwell's kidnapping and deprogramming of Molko were the actual causes of Molko's damages—i.e., that Molko's damages were the result of a *different harm* than the one for which the Church might be held liable. Although the Church may freely attempt to convince the jury that Maxwell's actions rather than its own caused any damages Molko suffered, it does not allege that it and Maxwell are in some way mutually liable for the same harm; thus it does not state facts sufficient to support an indemnification action.

Accordingly, we leave for another day the question whether an intentional tortfeasor may obtain indemnity from concurrent intentional tortfeasors on a comparative fault basis.

## VII. Conclusion

For the reasons given above, we conclude as follows: On the complaint, the judgment of the Court of Appeal is affirmed insofar as it affirms the summary judgment for the Church on the cause of action for false imprisonment, and reversed insofar as it affirms the summary judgment for the Church on the causes of action for fraud, intentional infliction of emotional distress, and restitution. On the cross-complaint, the judgment of the Court of Appeal is affirmed insofar as it reverses the judgment of dismissal for cross-defendant Maxwell on the cause of action for federal civil rights violations, and insofar as it implicitly affirms the judgment of dismissal for Maxwell on the Church's cause of action for indemnity.

Lucas, C. J., Broussard, J., Arguelles, J., Eagleson, J., Kaufman, J., concurred.

**ANDERSON (Carl W.), J.,**\* Concurring and Dissenting.—I concur with the majority regarding the disposition of the false imprisonment cause of action as well as the claims raised in the cross-complaint, but respectfully

---

\* Presiding Justice, Court of Appeal, First Appellate District, Division Four, assigned by the Chairperson of the Judicial Council.

disagree with the reversal of summary judgment in connection with the fraud, intentional infliction of emotional distress and the restitution counts. I am strongly persuaded that the imposition of tort liability for "heavenly deception" in proselytizing and for its ensuing "systematic manipulation of social influences" (religious persuasion) runs counter to established legal precedents and the free exercise clause of the First Amendment. Furthermore, imposition of liability in such cases constitutes bad legal policy, since it unnecessarily projects the court into the arena of divining the truth or falsity of religious beliefs. I respectfully suggest that the trial court's thorough analysis and the Court of Appeal's well-reasoned affirmance thereof correctly apply the law.

## I. *Fraud*

Under well-settled law, the necessary elements of fraud are: (1) misrepresentation (false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage. (*Seeger* v. *Odell* (1941) 18 Cal.2d 409, 411 [115 P.2d 977, 136 A.L.R. 1291]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 446, p. 2711.) It is likewise recognized that in order to render the fraud actionable, the misrepresentation or nondisclosure must be not only the cause in fact (causa sine qua non), but also the legal or immediate cause of the damages. Indeed, the majority quite agrees: "Justifiable reliance exists when the misrepresentation or nondisclosure was *an immediate cause* of the plaintiff's conduct which alters his legal relations, and when without such misrepresentation or nondisclosure he would not, in all probability, have entered into the contract or other transaction. (*Wennerholm* v. *Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713, 717 [128 P.2d 522, 141 A.L.R. 1358]; *Spinks* v. *Clark* (1905) 147 Cal. 439, 444 [82 P. 45].)" (Italics added.) However, contrary to the conclusion reached by the majority, I find appellants' fraud cause of action fatally defective for two fundamental reasons: (1) the record fails to show that the initial fraud committed by the proselytizers was relied upon by appellants at the crucial time of joining the Church; and (2) the immediate cause of appellants' damages was not the incipient fraud but rather the ensuing indoctrination and conversion (dubbed by the majority as "brainwashing"). However, the indoctrination achieved by persuasion absent physical force or violence is not unlawful; religious conversion is simply not subject to judicial review. It follows that neither of these questions creates a triable issue of fact which defeats the grant of summary judgment.

### A. *Reliance on Initial Misrepresentations*

In granting summary judgment on the fraud cause of action, the trial court found that appellants, by their own admissions, joined the Unification

Church (Church) because that "Association satisfied personal concerns and anxieties both were experiencing"; it did not find they joined in reliance on the initial misrepresentations of the recruiters. This finding of the trial court is well supported by the record.

Molko's deposition reveals that his reason for accepting the invitation to participate was to improve himself and to become a better person. As early as the second day spent in Boonville, Molko already felt involved and was attracted to the group because of the brotherly love experienced there. Although the regimented life was not entirely to his liking, he stayed there because: (1) he was thinking about the meaning of his life; (2) he was curious; and (3) he wanted to know people better, especially Bethie Rubenstein and Gloria LaGrasse who were "fascinating, intelligent—a joy to be with." On learning within less than two weeks that the group belonged to the "Moonies," Molko (while admittedly confused a bit) took a "wait and see" attitude, remained with the group and repeatedly rejected calls coming from friends and parents imploring him to quit.

Leal accepted the initial invitation also for personal reasons. She had little emotional and psychological support from her family and was longing for affection and understanding. She left San Diego, a "cold and impersonal" city in search of a community. She went to Boonville to "learn how a community gets together to actually accomplish something." By the fourth day she felt completely involved. She was attracted by the sincere, affectionate attention she received from the group and stayed there because she was happy and grew attached to the group which overwhelmed her with praise and love and promised to take care of her and provide all the things she had ever wanted. In addition, she was impressed by the commitment and hard work of the others, and was anxious to prove herself worthy of their attention. Also, she found the relinquishment of individual responsibility and the acceptance of a group identity to be true happiness, akin to "the joy of childhood." In her own words: "Departing from Boonville was prevented as a result of large doses of attention and listening and care such as that between highly expressive, loving friends or family."

Despite these undisputed facts the majority maintains that appellants' behavior following the initial fraud did not negate the element of reliance (i.e., the initial fraud was not "cured"); they conclude that as a result of the Church's initial "heavenly deception" (i.e., fraudulent conduct), appellants were placed in a situation where they were "brainwashed" and thereby deprived of their independent judgment. The majority predicates this "brainwashing" theory primarily upon appellants' declarations that due to the rigid indoctrination, psychological and emotional pressure, they lost their ability to freely decide to stay with the group and, instead, they acted in a robot-like manner. Such conclusion fails to withstand critical analysis.

Under the widely adopted view, the fact that the religious belief does not originate in a voluntary choice does not, as a rule, raise a presumption of incapacity to affirm the belief as one's own. (Shapiro, *"Mind Control" or Intensity of Faith: The Constitutional Protection of Religious Beliefs* (1978) 13 Harv. Civ. Liberties L.Rev. 751, 789.) To the contrary, it has been said that "An intentional deception should not justify impinging upon a convert's ideas, so long as the convert has the ability to affirm his faith after the deception is realized. If he retains his personhood [i.e., the capacity to evaluate the commitment], . . . he can still adopt or ratify the beliefs as his own." (Shapiro, *Of Robots, Persons and the Protection of Religious Beliefs* (1982-1983) 56 So.Cal.L.Rev. 1277, 1295.) By illustration, Mr. Shapiro points out that if the proselytizer had offered merely a self-improvement course and the subsequent banquet and lectures in fact had aimed at converting the recruit to a religion, the deceptiveness of the introduction would be immaterial as long as the convert would be still capable of adopting or affirming his belief. (*Ibid.*)

The evidence before us, including appellants' depositions, clearly indicates that the Church's indoctrination did not render appellants mindless puppets or robot-like creatures. Instead, it shows that both before and after the disclosure of the group's true identity, both appellants retained their ability to think, to evaluate the events and to exercise their independent judgment. For example, the record reveals that on the first two days in Boonville Molko became so dissatisfied with the regimented life that he decided to return to San Francisco. He discussed his decision with two other members of the group. While he was advised that he was free to leave, he decided to stay because he was persuaded that it was to his own benefit to do so. Also, during the first week in Boonville Molko expressed with other people (although in private) his resentment about the lectures and regimentation and on noticing that he was being followed by Joe Taylor, a Church member, he violently confronted him, threatening to smash him in the face. After learning that the group was connected with the Church, Molko did not simply acquiesce, but rather consulted Gloria, and his decision to stay was again the result of an evaluation of this turn of events. Lastly, despite all the lectures, discussion and other forms of indoctrination, Molko still doubted that Reverend Moon was the new Messiah and he shared his doubts with other Church members as well, including Gloria and Victoria.

The deposition testimony of appellant Leal is likewise replete with facts indicating that her joining the Church did not rest upon reliance on the initial representation, but rather her conscious evaluation and adoption of the Church's teachings. In view of this sworn testimony, the unsupported allegations of brainwashing in appellants' pleadings and declarations should

not be deemed sufficient to raise that triable issue of material fact which requires reversal of the grant of summary judgment.

## B. *Conversion Is the Immediate Cause of Damages*

Reversal of summary judgment is improper for the additional reason that the immediate cause of damages was not the incipient fraud, i.e., heavenly deception, but rather the ensuing indoctrination effected by "brainwashing" which ultimately resulted in appellants' conversion. That the gist of appellants' fraud complaint was that the conversion was achieved by actionable "brainwashing" is manifest. Indeed, the majority so defines the issue (*ante,* at p. 1109): "Molko and Leal therefore contend that a triable issue of fact remains as to whether the Church brainwashed them prior to disclosing its identity. If the answer is affirmative, they urge, they have established justifiable reliance." Again, the majority declares that appellants' "statements are consistent with the contention that they were deceived into a situation in which they were then brainwashed" and summary judgment on the fraud count must be overturned because the brainwashing theory advanced in appellants' declarations presented a triable issue of fact. This same notion not unsurprisingly has its genesis in appellants' briefs. For example, Molko asserts in his opening brief that "By means of deceits and deceptions utilized in order to place plaintiff in Boonville, plaintiff was abruptly thrust into an environment directed entirely toward the *conversion* of plaintiff's allegiance to accept Sun Myung Moon as the Messiah and to become a member of the Unification Church . . . . The *conversion* of plaintiff occurred in an unusual place." (Italics partially added.) Amici curiae likewise emphasize that the immediate cause of damages was the process of conversion which has been known by many labels—brainwashing, thought reform, coercive persuasion, etc.

Identification of the indoctrination (i.e., "brainwashing") and the conversion as the critical issues for determining the applicability of summary judgment carries far-reaching legal significance. For under settled law the indoctrination methods employed in obtaining conversion (including coercive persuasion, mind control and/or brainwashing) are not actionable per se; religious conversion is not subject to judicial scrutiny regardless of the methods used because such scrutiny necessarily entails the questioning of religious faith—scrutiny that is absolutely forbidden by the First Amendment. Moreover, even if judicial scrutiny were permitted, governmental interference in this case is not warranted.

### (1) *The Indoctrination Is Not Actionable*

The primary cases holding that religious indoctrination, even if achieved by "brainwashing," is not tortious if unaccompanied by physical force or

threat are *Lewis* v. *Holy Spirit Ass'n for Unification* (D.Mass. 1983) 589 F.Supp. 10; *Meroni* v. *Holy Spirit Ass'n for Unification* (1986) 119 App.Div.2d 200 [506 N.Y.S.2d 174]; and *Application of Conversion Center* (1957) 388 Pa. 239 [130 A.2d 107].

The *Lewis* plaintiff, a former member of the Unification Church, brought a tort action against the Church alleging, inter alia, that he was subjected to brainwashing and that as a result thereof he suffered psychiatric disorders. In dismissing plaintiff's tort claims, the court stated: "Both of the plaintiff's claims in tort are seriously flawed. Indoctrination and initiation procedures and conditions of membership in a religious organization are generally not subject to judicial review [citations]. Similarly, the plaintiff has not indicated any precedent for recognition of the tort of brainwashing, and my own research has revealed none." (*Lewis* v. *Holy Spirit Ass'n for Unification, supra,* 589 F.Supp. at p. 12.)

In *Meroni,* the plaintiff's son entered the training and indoctrination program of the Unification Church; after one month he left the program and committed suicide. In an action against the Church plaintiff purported to state causes of action in tort contending that the decedent, an emotionally disturbed youth, was subjected to highly programmed behavior techniques (such as intensive physical exercises, isolation, lectures, confession, strict work and study schedules) as a result of which he was brainwashed. In dismissing the action the court opined that the indoctrination methods of the Church were not tortious. "The conduct of the defendant Unification Church . . . which the plaintiff seeks to classify as tortious, constitutes common and accepted religious proselytizing practices, e.g., fasting, chanting, physical exercises, cloistered living, confessions, lectures, and a highly structured work and study schedule. To the extent that the plaintiff alleges that the decedent was 'brainwashed' as a result of the church's program, this claim must be viewed in the context of the situation as a whole, i.e., as a method of religious indoctrination that is neither extreme nor outrageous . . . ." (*Meroni* v. *Holy Spirit Ass'n for Unification, supra,* 506 N.Y.S.2d at p. 177.) In finding the brainwashing nontortious in the absence of physical violence or mental torture, the court remarked: "It is important to note that no facts are set forth which would warrant the conclusion that the plaintiff's decedent was falsely imprisoned by the appellant or that he was subjected to any form of violence, or physical or mental torture, as such. The claim of *brainwashing is* based upon the activities heretofore described, which, as previously noted, are *commonly used by religious and other groups, and are accepted by society as legitimate means of indoctrination. They are not classifiable as so* extreme or outrageous, or *offensive to society, as to incur liability therefor.*" (*Id.,* at pp. 177-178, italics added.)

In *Application of Conversion Center, supra,* 130 A.2d 107, the court recognized that persuasion is an integral part of many religious organizations and

a positively protected aspect of the free exercise of religion: "The 14th Amendment of the Constitution of the United States which incorporates the 1st Amendment, guarantees the free exercise of religion . . . . Not only is a citizen of this country entitled to the free expression of his religious beliefs, but *he may by peaceful persuasion endeavor to convert others thereto,* and we are aware of no bar to individuals organizing to effectuate their guaranteed rights in this regard. . . . '. . . Propagation of belief—or even of disbelief in the supernatural—is protected whether in church or chapel, mosque or synagogue, tabernacle or meetinghouse. . . .' " (*Id.,* at p. 110, italics added.)

### (2) *The Conversion Is Not Actionable*

The majority concedes that the free exercise clause of the First Amendment provides absolute protection for religious beliefs (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1352]); that the government cannot discriminate against individuals or groups because they hold views abhorrent to the authorities (*Fowler* v. *Rhode Island* (1952) 345 U.S. 67, 70 [97 L.Ed. 828, 831, 73 S.Ct. 526]); and that while the court can inquire into the sincerity of an individual's beliefs, it may not judge the truth or falsity of those beliefs (*United States* v. *Ballard* (1944) 322 U.S. 78, 86-88 [88 L.Ed. 1148, 1153-1155, 64 S.Ct. 882]). However, the majority concludes that while religious belief is absolutely protected, religious conduct is not (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 402-403 [10 L.Ed.2d 965, 969-970, 83 S.Ct. 1790]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718 [40 Cal.Rptr. 69, 24, 28-36, 394 P.2d 813]); that conduct even if religiously motivated is subject to regulation for the protection of society (*Cantwell* v. *Connecticut, supra,* 310 U.S. at p. 304 [84 L.Ed. at p. 1218]); and that the Church's initial fraud which led to the brainwashing of appellants was conduct which, under the balancing test required by the First Amendment, can be penalized with tort sanctions based upon a compelling state interest (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 214, 221-235 [32 L.Ed.2d 15, 92 S.Ct. 1526]).

I respectfully submit that this reasoning is flawed. To begin with, the conduct which according to the majority constitutes a triable issue of fact is not only the initial fraud (an act clearly subject to proof), but also the subsequent "brainwashing" and conversion—matters comprising not only sociological or psychological phenomena, but also involving intangible elements of religious belief. It follows that brainwashing and conversion are so inextricably intertwined with religious faith that they cannot be scrutinized, much less proven, without questioning the authenticity of the religious teachings of the Church. (See detailed discussion, *infra.*) Such inquiry is absolutely proscribed by the free exercise clause of the First Amendment.

The proposition that the act or conduct of a religious organization or its members is immune from judicial scrutiny if the proof thereof calls into

question the truth or falsity of religious faith is well established in case law as well as in legal commentary.

*United States* v. *Ballard, supra,* 322 U.S. 78, the leading case defining the parameters of the constitutional protection of religious faith, dealt with prosecution of religious fraud. Therein it was alleged that respondents, founders of the "I am" movement, fraudulently represented that they were divine messengers; that they had miraculous powers to heal all diseases and, in fact, had cured hundreds of afflicted people; and that as a result of these misrepresentations, they obtained money from the public through the mail. The trial court excluded from jury consideration the issue of the truth or falsity of respondents' claim of divine designation and miraculous powers, and the case was submitted on the sole issue of whether respondents made those claims in good faith. In approving the trial court's ruling, the Supreme Court reasoned: "Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. [Citation.] It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. *Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs.* Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. *Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain."* (*Id.,* at pp. 86-87 [88 L.Ed. at p. 1154], italics added.)

Another analogous case involving religiously motivated fraud is *Founding Church of Scientology* v. *United States* (D.C. Cir. 1969) 409 F.2d 1146

[133 App.D.C. 229, 13 A.L.R.Fed. 721]. In *Founding Church,* appellants (Church of Scientology and its adherents) were charged with false and misleading labeling under the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.), based upon their representation that the Hubbard Electrometer (E meter) can cure both bodily and mental ailments.[1] The government seized the electric instruments and religious literature describing church doctrine and alleged that they were the instrumentalities by which the fraud was committed. At trial the government introduced expert evidence showing that the E meter was of no use in the diagnosis and treatment of any disease or mental disorder (i.e., that the church's representations were false), and it also introduced thousands of pages of scientology literature relevant to the issue of mislabeling. Based thereon, the jury found appellants guilty of false and misleading labeling. The Court of Appeal reversed in concluding that under *Ballard* expert testimony was not admissible to disprove appellants' representations and that the religious Scriptures of the church were not subject to courtroom evaluation. Significantly enough, the court noted: "The statements concerning the powers of auditing over the ills of mind and body are not readily separable from general statements of Scientological doctrines concerning the nature of man and the relationship of his mind to his body. Many will find these doctrines, those which relate to health as well as those which do not, absurd or incoherent. But the *Ballard* case makes suspect the legal inquisition of such doctrines where they are held as religious tenets." (*Id.,* at p. 1159.)

Even more analogous to this case is *Katz* v. *Superior Court* (1977) 73 Cal.App.3d 952 [141 Cal.Rptr. 234], in which the parents of Unification Church members brought an action for conservatorship: they claimed that their children were subjected to coercive persuasion and brainwashing through food and sleep deprivation, isolation, fear tactics, use of guilty feelings and indoctrination; they offered psychiatric and psychological expert evidence to establish such claims. The *Katz* court was unwilling to inquire into the merit of the assertions because it felt the evaluation of evidence relevant to whether the change in the individual's life style was effected by brainwashing or religious faith, necessarily requires an investigation and questioning of the validity of that faith. (*Id.,* at pp. 987-988.)

The majority's effort to distinguish *Katz* from the case at bench is not persuasive. While *Katz* arose, indeed, in a somewhat different legal setting (i.e., the action was brought by the parents rather than ex-church members; they were seeking conservatorship orders under Prob. Code, § 1751; and their purpose was to deprogram their children, etc.), the pivotal issue was

---

[1] Scientology teaches that by "clearing" or "auditing" the mind, one can improve both spiritual and bodily health. The E meter plays an essential role in the process of auditing. The vast literature describing scientology claims, inter alia, that many bodily ailments, including cancer, may be cured by auditing.

the same: were the children brainwashed by the church and was their brainwashing subject to proof in a court proceeding?

I respectfully disagree with the majority's suggestion that the primary assertion here, as opposed to *Katz*, is the initial fraud in recruiting, and is therefore conduct which can be judicially scrutinized. From their language, however, it clearly appears that the wrongful conduct which is at the core of the controversy is the fraudulently induced brainwashing.[2] However, as the majority admits, the first part of the issue (i.e., the knowing misrepresentation of the Church's identity and the intent to induce appellants to participate in the Church's activities) is conceded by the Church. The remaining triable issue of fact is therefore limited to the alleged "brainwashing" which resulted in appellants' conversion and their joining the Church. What fact is it that the majority remands to be determined at trial? The same fact that *Katz* found immune from judicial scrutiny, i.e., was the conversion (or "brainwashing") induced by coercive indoctrination or by religious persuasion? That such question is not for mortal courts to resolve is unequivocally answered by *Katz*: No such proof or judicial inquiry is possible without questioning the person's underlying faith—an inquiry which is absolutely forbidden by the First Amendment.

The teachings of *Katz* that "brainwashing" and religious conversion are not really distinguishable; that the methods used in each are either identical or very similar; and that proof of the existence of each is virtually identical are well illustrated by the present case. The expert testimony here was offered to show that the brainwashing of appellants was achieved by "a systematic manipulation of social influences" which consisted mainly of the following: (1) control over the social and physical environment; (2) separation of the recruits from the outside world (including friends and family members); (3) influencing individual behavior through rewards, punishments and experiences; (4) oppression of criticism of the Church; and (5) attainment of a special uniform state of mind. However, as demonstrated below, all of these methods are used by the more widely accepted and/or tolerated churches in effecting religious conversion.

The effect of conversion, generally speaking, is spiritual rebirth—that is, attainment of a new life. The first step in that direction is a separation from the previous environment to a place where one can meditate and contemplate without distraction. Our world's numerous monasteries and convents demonstrate how retreat and isolation can promote single-minded devotion

---

[2] In the words of the majority: "The legal question is simply whether a religious organization can be held liable on a traditional cause of action in fraud for deceiving nonmembers into subjecting themselves, without their knowledge or consent, to *coercive persuasion*" and "The challenge is to the Church's practice of misrepresenting or concealing its identity in order to bring unsuspected outsiders into its *highly structured environment*." (Italics added.)

to God. The separation from friends and family members may be an important step in achieving this goal. Jesus Christ is quoted as saying: "He who loves father or mother more than me is not worthy of me." (Matthew, 10:34-38.) The Mennonites likewise teach that true Christians must be prepared to take upon themselves the cross of Christ, and forsake father, mother, husband, wife, children, possessions and the self, for the sake of the testimony of His Holy Word when the honor and praise of God require it. (J. Wenger, Glimpses of Mennonite History and Doctrine (2d ed. 1947).) Although transcending one's family may be traumatic and painful, it is sometimes an essential element in the pilgrimage of faith. The guilt and awareness of sin also may be an important factor leading to conversion. The promise of salvation and the threat of damnation are the very foundation of the life of the devout. Ascetic, regulated life, hard work, fasting and giving up earthly pleasures are also parts of many religious teachings aimed at spiritual purity and pleasing God. The dogmatic approach and intolerance of criticism are not uncommon with established religions which profess that divine truth is revealed in Holy Scriptures, church dogmas and in *ex cathedra* declarations of anointed leaders (e.g., papal infallibility in the Catholic Church) which is not to be questioned by faithful followers. Finally, the introverted view forsaking interest in the outside world necessarily flows from the religious teaching that one must separate himself or herself from the world dominated by Satan and his evil forces in order to join and serve God's kingdom.

Indeed, what this expert evidence characterizes as indicia of brainwashing or mind control, might very well be equated with the more popularly accepted symptoms of genuine religious conversion. Religious behavioral change induced by the mystery of faith cannot be proved or disproved by secular science, which limits its scope of inquiry to tangible, rational and logical phenomena, comprehensible and explainable by human reasons. As Mr. Shapiro states in his essay: "Religious beliefs—whether held by adherents to new sects or by 'mainstream' believers—may not be dictated by societal norms. Such norms can easily encourage labels that transform religious beliefs into illnesses. 'A religion becomes a cult; proselytization becomes brainwashing; persuasion becomes propaganda; missionaries become subversive agents; retreats, monasteries, and convents become prisons; holy ritual becomes bizarre conduct; religious observance becomes aberrant behavior; devotion and meditation become psychopathic trances.'" (Shapiro, *Of Robots, Persons, and the Protection of Religious Beliefs, supra,* 56 So.Cal.L.Rev. at pp. 1316-1317, fn. omitted.) A similar analysis has been advanced by Justice Jackson: "[religious] experiences, like some tones and colors, have existence for one, but none at all for another. They cannot be verified to the minds of those whose field of consciousness does not include religious insight. When one comes to trial which turns on any aspect of

religious belief or representation, unbelievers among his judges are likely not to understand and are almost certain not to believe him. . . . Prosecutions of this character easily could degenerate into religious prosecution." (*United States* v. *Ballard, supra,* 322 U.S. at pp. 93, 95 [88 L.Ed. at pp. 1157, 1158] [dis. opn. of Jackson, J.].)[3]

### (3) *The Church's Conduct Is Not so "Outrageous" as to Be Subject to Governmental Regulation*

Case law teaches that overt acts or conduct connected with the exercise of religion are subject to governmental interference only if the conduct poses *substantial* threat to the public safety, peace or order. As the Supreme Court stated: " '*only the gravest abuses, endangering paramount interest* give occasion for permissible limitation.' " (*Sherbert* v. *Verner, supra,* 374 U.S. at p. 406, italics added.) This was reiterated in *Wisconsin* v. *Yoder, supra,* 406 U.S. at page 215 [32 L.Ed.2d at p. 25]: "[O]nly those *interests of the highest order* and those not otherwise served can overbalance legitimate claims to the free exercise of religion." (Accord *Thomas* v. *Review Bd. Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 717-718 [67 L.Ed.2d 624, 633-634, 101 S.Ct. 1425], italics added.)

The majority opinion rests on a theory of fraudulently induced brainwashing. However, the conduct of "brainwashing" itself is not actionable because that method is commonly employed by religious groups, and it fails to constitute that outrageous conduct which goes beyond the limits of social toleration. (*Meroni* v. *Holy Spirit Ass'n, supra,* 506 N.Y.S.2d 174; see also *Christofferson* v. *Church of Scientology* (1981) 57 Ore.App. 203 [644 P.2d 577, 584, 40 A.L.R.4th 1017].) Thus, the critical issue is whether the act of brainwashing becomes tortious because it was preceded by the wrongful act of "heavenly deception" employed in recruiting.

It bears emphasis, and indeed the majority concedes, that the claimed deceptions, although secular on the surface, are clearly "rooted in religious belief." (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 215 [32 L.Ed.2d at p. 25].) It is settled that the Constitution guarantees not only the free exercise of

---

[3]The trial court granting summary judgment for defendants eloquently voiced this same concern: "The declarations of Dr. Singer and Dr. Benson reveal that both doctors rest their opinions in large part upon the view that Defendants' recruitment techniques involve 'systematic manipulation of social influences' which, both doctors conclude, lead Plaintiffs to make choices they would not have made in the 'free exercise of (their) own will and intellect.' But *these are not statements which are either true or false*; they are veiled value judgments concerning the entire outlook of the Unification Church. *What is 'systematic manipulation' to some may be the only true outlook to others.* . . . [¶] Testing the uncontroverted facts here by the principles applicable to regulation of acts of religious organizations and their members, as *Katz* requires, imposition of liability cannot be constitutionally countenanced." (Italics added, fns. omitted.)

religion, but also protects certain acts undertaken in furtherance of these religious beliefs. Included among these acts are the proselytizing and indoctrination activities of religious organizations. As explained in *McDaniel* v. *Paty* (1978) 435 U.S. 618, 626 [55 L.Ed.2d 593, 600, 98 S.Ct. 1322]: "the right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions." *Turner* v. *Unification Church* (D.R.I. 1978) 473 F.Supp. 367 further teaches that indoctrination and the motivation of one who joins a religious group usually cannot be judicially scrutinized and that only "the 'operational activities' of a religion, those activities that are not solely in the ideological or intellectual realm, [that] are subject to judicial review and may be regulated to achieve a sufficiently important state objective. [Citations.]" (*Id.,* at pp. 371-372.) The examples listed by the majority for the permissibility of government interference with religious affairs are consistent with *Turner* inasmuch as they all involve operational activities of the religious organization (i.e., law against polygamy, distribution of religious literature, compulsory vaccinations, license for religious parades, denial of tax exempt status, etc.), rather than intellectual or doctrinal matters, such as proselytizing and indoctrination.

Thus, a persuasive argument may be made that the principal wrong here claimed (i.e., "heavenly deception" in recruiting) is not subject to government intervention at all, because it includes doctrinal matters rather than operational activities. But even if we assume that such acts are purely "secular" in nature and may properly be regulated by government, they fail to amount to an abuse of such magnitude that would justify government interference under the strict balancing test prescribed by law. This is so because the First Amendment ensures wide protection for religious persuasion which may encompass not only exaggeration, but also outright falsehood. As stated in *Cantwell* v. *Connecticut, supra,* 310 U.S. at p. 310 [84 L.Ed. at p. 1221]: "*In the realm of religious faith,* and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. *To persuade others to his own point of view, the pleader,* as we know, at times, *resorts to exaggeration,* to vilification of men who have been, or are, prominent in church or state, *and even to false statement.* But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." (Italics added.)

In sum, I am firmly convinced that since "heavenly deception" and its ensuing "brainwashing," fail to constitute those gravest abuses, this court is powerless to impose tort sanctions thereon.

Finally, I find an additional reason for holding that imposition of tort sanctions is particularly inappropriate in the present instance. Case law

emphasizes that only a compelling governmental interest supported by *ample evidence* can justify state regulation of religious practices. (*Wisconsin* v. *Yoder, supra,* 406 U.S. at pp. 215, 224-225 [32 L.Ed.2d at pp. 25, 30-31].) In the case at bench, the State of California has made no claim that such governmental interest exists, nor has it enacted any statute or regulation purporting to restrict the practices at issue. When scrutinizing conduct which is ostensibly subject to constitutional protection and which can be regulated only by showing a compelling state interest, the judiciary should tread cautiously in independently *creating* such governmental interest without any prior consideration by the Legislature. The Legislature is far better equipped than this court to undertake the factual investigation and to formulate the social policies which justify restrictions on exercising religious freedoms. Indeed, in the overwhelming majority of cases courts have merely *upheld* state regulations curbing religious conduct rather than *creating* such regulation. The majority's creation of this new tort liability in such an historically heretofore sensitive area, without either legislative initiative or guidance, constitutes judicial activism of the first degree.

## II. *Intentional Infliction of Emotional Distress*

The elements of a cause of action for intentional infliction of emotional distress are: (1) outrageous conduct by the defendants; (2) intention to cause or reckless disregard of the probability of causing emotional distress; (3) severe emotional suffering; and (4) actual and proximate causation of the emotional distress. (*Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288 [131 Cal.Rptr. 547], disapproved on other grounds in *Marina Point, Ltd.* v. *Wolson* (1982) 30 Cal.3d 721, 740, fn. 9 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161]; Rest.2d Torts, § 46.) The conduct is deemed extreme and outrageous when it exceeds " ' "all bounds [of decency] usually tolerated by a decent society, [and is] of a nature which is especially calculated to cause, and does cause, mental distress. . . ." ' " (*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 155, fn. 7 [233 Cal.Rptr. 308, 729 P.2d 743].) In order to successfully resist a motion for summary judgment the plaintiff must sustain each element of the cause of action; conversely, the defendant is entitled to summary judgment if proof of any one element is lacking. (*Stationers Corp.* v. *Dun & Bradstreet* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

Respondents herein contended that the emotional distress cause of action was inherently defective because the Church's conduct was not outrageous within the meaning of the law. The majority has rejected this argument by finding that the very same wrong (i.e., the fraudulent inducement of appellants into an atmosphere where they could be brainwashed), served as the foundation of both the fraud and the emotional distress causes of action because the conduct complained of was both extreme and outrageous. I

respectfully submit that the conclusion of the majority is erroneous and unsupported by legal authorities.

As discussed above, appellants failed to state actionable wrong on the fraud count. A fortiori, the same allegedly fraudulent conduct cannot furnish the legal premise for the emotional distress cause of action.

But even if the fraud cause of action were valid, it would not, ipso facto, constitute outrageous conduct giving rise to recovery for causing severe emotional distress. The bootstrapping reasoning of the majority that the very same fraudulent conduct automatically produces a double cause of action (i.e., for fraud as well as for intentional infliction of emotional distress) has been unequivocally rejected by persuasive case authorities.

For example, in *LeCroy* v. *Dean Witter Reynolds, Inc.* (E.D.Ark. 1984) 585 F.Supp. 753, plaintiff brought an action for fraud and intentional infliction of emotional distress growing out of defendant's intentional misrepresentation and wilful concealment in connection with selling securities. The court rejected plaintiff's emotional distress claim by stating: "The Court recognizes that deception and fraud associated with the sale of securities can, on occasion, create emotional distress. Moreover, a broker's repeated use of such unsavory business methods purely in the pursuit of exploitation and financial gain can offend the conscience of the average citizen. *Yet . . . mere fraud in connection with the sale of securities does not ipso facto make out a prima facie case for intentional infliction of emotional distress. Unless the defendant's acts are truly outrageous, an action for intentional infliction of emotional distress will not lie.*" (*Id.,* at p. 766, italics added.)

In referring to Restatement Second of Torts section 46, comment d, the court emphasized that " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " (*LeCroy* v. *Dean Witter Reynolds, Inc., supra,* 585 F.Supp. at pp. 763-764, italics omitted.)

In *Barrett* v. *Farmers & Merchants Bank* (Ala. 1984) 451 So.2d 257, plaintiff instituted an action against defendant bank and its vice president to recover damages for wantonness, outrage, fraud and conversion in connection with the payment of life insurance policy proceeds. In ruling against plaintiff, the court held that the tort of outrageous conduct was not established by a showing of mere fraud; rather, it should have been shown that defendant's conduct was such as not to be tolerated in a civilized society. (*Id.,* at pp. 263-264.)

In *Christofferson* v. *Church of Scientology, etc., supra,* 644 P.2d 577, a case factually close, plaintiff complained that defendant church took control

of her mind and forced her into life service by way of fraudulent representations. In rejecting plaintiff's claim premised on intentional infliction of emotional distress, the court emphasized: "Plaintiff was recruited and indoctrinated into the Church of Scientology. That recruitment and indoctrination . . . were not so very different than might be used by any number of organizations. She joined the group voluntarily, albeit, as she claims, on the basis of misrepresentations made to her. However, she continued to participate and maintained her involvement for whatever reason without actionable threat or coercion by defendants." (*Id.,* at pp. 590-591.) "If misrepresentations were made regarding the benefits or nature of Scientology . . . her remedy would be for fraud, not outrageous conduct." (*Id.,* at p. 590.)

And finally, in *Meroni v. Holy Spirit Assn. for Unification, supra,* 506 N.Y.S.2d 174, the court was confronted with the nearly identical issue, i.e., whether brainwashing by defendant Unification Church constituted outrageous conduct rendering it liable for intentional infliction of emotional distress. In finding it did not, the court emphasized that no outrageous conduct has been presented inasmuch as "The plaintiff has failed to demonstrate that the recruitment and indoctrination techniques used by the appellant, which are similar to those used by a number of other organizations 'go beyond all possible bounds of decency, and [are] to be regarded as atrocious, and utterly intolerable in a civilized community' . . . ." (*Id.,* at p. 177.)

### III. *Restitution*

Finally, I find myself in profound disagreement with the reversal of summary judgment on the restitution count. The majority's ruling as to this issue rests on the theory of fraud (fraudulent inducement to facilitate brainwashing) and undue influence.[4] However, neither of these theories support the cause of action at issue.

The uncontroverted evidence provided by Molko clearly demonstrates that he made the gift of $6,000 out of a then-held religious belief. Thus, Molko explained that he gave the money to the Church to please God, the Heavenly Father, and that he had not asked that the money be returned while a member of the Church, because he had been afraid of the evil forces and felt guilty of demanding back something he had given to God.[5] I quite

---

[4] The majority also mentions breach of confidential relationship by the Church as a potential basis for restitution. However, emphasis on the latter aspect does not add a new dimension to the cause of action because under well-settled law breach of fiduciary or confidential relationship is constructive fraud (i.e., a subspecies of fraud). (Civ. Code, § 1573; *Darrow v. Robert A. Klein & Co., Inc.* (1931) 111 Cal.App. 310, 315-316 [295 P. 566]; *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362, 1369 [229 Cal.Rptr. 16].)

[5] The pertinent part of the record reads as follows: Molko was told (and at that time he believed) that "The Heavenly Father is asking to help us . . ."; that "[y]ou are giving a benefit to God and he would look favorably on that"; "that it was tax time and that the church was

agree with the trial court's finding: "Careful review of Mr. Molko's deposition testimony negates the conclusionary allegations contained in the Complaint." Molko made his gift after careful consideration and consultation with one of the two Church members in whom he had the greatest confidence.[6] That he did not part with all his savings further negates the conclusionary allegations of undue influence in his complaint and indisputedly establishes the gift as a product of his free will.[7]

Since this gift was indisputably prompted by religious beliefs, and the issue of fraudulent inducement cannot be determined without inquiring into the truth or falsity of such beliefs, the theory of fraud as a ground justifying restitution cannot be judicially entertained without transgressing the free exercise clause of the First Amendment. (See detailed discussion, *supra*.) This same reasoning is equally applicable to the undue influence theory of recovery; as with the theory of fraudulent inducement, it is so intricately interwoven with religiously held beliefs that it cannot be proven without questioning the verity of underlying religious doctrines. (*Estate of Supple* (1967) 247 Cal.App.2d 410 [55 Cal.Rptr. 542].)

That civil courts may not entangle themselves in religious disputes arising between disgruntled ex-church members and the Church, is well supported by case law as well as by legal scholars. In *Watson* v. *Jones* (1872) 80 U.S. 679, 731 [20 L.Ed. 666, 677], the United States Supreme Court emphasized: " 'the judicial eye cannot penetrate the veil of the church for the forbidden purpose of vindicating the alleged wrongs of excised members; when they became members they did so upon the condition of continuing or not as they and their churches might determine, and they thereby submit to the

---

in desperate need of funds, and that it would be most—that the Heavenly Father would really appreciate, and really look favorably on seeing me give the money to the church . . ."; and "[t]hat you gave God money and then God, used your money rather than you using your money, and it worked better that way. In other words, you give your money to God and then God can distribute your money. And that way, the spiritual world can work for you."

The reason Molko did not ask for the return of his gift is reflected by the following excerpts: "Q. Did you ever feel that you should ask for the money back in order to—[¶] A. Yes, I thought about that. [¶] Q. But you never asked for it back? [¶] A. The situation was such that I—there was too much guilt and too much fear to ask. You just don't ask something like that. [¶] Q. What in particular were you afraid of happening if you did not—if you did ask for the money back? [¶] A. That something evil could happen to me. [¶] Q. You were afraid that by asking for your money back from the church, that something evil—[¶] A. No, not something —[¶] Q.—would happen to you? [¶] A. You see, some evil force. You have to understand, I really believed that there was evil forces lurking around. And that if I disturbed the spiritual world enough, that something could happen. I believed that. And therefore, I felt a terrible sense of guilt and fear to ask for something that I had supposedly given to God."

[6] He testified that she told him she "thought I should do what I thought was best" and "was pretty much leaving it up to me."

[7] When referring to the several thousand dollars which were available to him and which he did not disclose to Church members, he stated, "I drew the line. . . . They were quite under my control, but they stayed where they were."

ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals.' " In *Founding Church of Scientology* v. *United States, supra,* 409 F.2d 1146, speaking to the same issue, the court stated: "under *Ballard* it seems unlikely that a disgruntled former adherent could sue a church for fraud and deceit because it had collected money from him on the basis of allegedly 'false' doctrines . . . ." (*Id.,* at p. 1156, fn. 32.)

*Estate of Supple, supra,* 247 Cal.App.2d 410, 414, reaffirms that religious gifts made to a church cannot be set aside by a court on the grounds of fraud or undue influence because the entertainment of such issues is foreclosed by the constitutional guarantees of religious freedom contained in the First Amendment and applied in *Ballard, supra,* 322 U.S. 78.[8]

Finally, Professor Tribe, a highly respected constitutional scholar, fearing entanglement with church affairs, expressed his concern thusly: "Once it is conceded that first amendment values are unacceptably compromised when civil courts undertake to settle religious issues, it becomes clear that allowing a legal determination about property or some other secular matter to turn on a court's answer to a religious question represents a path fraught with peril: the path is one along which unsatisfied former believers could drag the civil courts into the theological thicket by the simple expedient of suing for a refund of their prior donations to a religious organization. . . . The same is true when a church contributor seeks return of a donation on the ground that the religious beliefs inducing the contribution were false; once we assume that the underlying dispute is properly characterized as religious, the suit for a refund becomes a transparent vehicle for invoking

---

[8] I disagree with the position of the majority that the complaint in *Estate of Supple* was not based upon fraud and undue influence; it clearly was. That opinion states: "It was also alleged that all of the above representations [i.e., that there are Heaven and Hell, eternal award and punishment depending on earthly conduct, etc.] were in fact false and untrue, constituting childish superstitions incompatible with man's advanced position in science and technology, and that *the charitable beneficiaries who made these representations were guilty of unduly influencing the testator and were also guilty of fraud* because they had made positive assertions which, although they believed them to be true, were not warranted by the information which they had (Civ. Code, § 1572, subd. 2) and because they had breached a duty which, without an actually fraudulent intent, gained them an advantage by misleading the testator to his prejudice and the prejudice of his heirs at law (Civ. Code, § 1573, subd. 1). . . . [¶] In this state of the case, *the beneficiaries* under the will *moved for judgment on the pleadings* against Smith *as to the fraud and undue influence counts* of his pleading, and against Hallinan as to his entire pleading. *On the same day, the beneficiaries also moved to strike the* Hallinan pleading and the *fraud and undue influence counts* of the Smith pleading. [¶] In due time the matter was heard and in ruling upon the matter, *the court* filed a memorandum opinion in which it *stated that the gist of the fraud and undue influence counts of the two pleadings was that the charitable beneficiaries named in the will had influenced the making of the will* by teaching the testator certain religious beliefs *which were in fact untrue* and which they had no reason to believe were true. . . ." (247 Cal.App.2d at pp. 412, 413, italics added.) Since the cited excerpts of the opinion clearly indicate that *Estate of Supple was* decided upon fraud and undue influence, it is not only relevant, but extremely persuasive.

governmental assistance to benefit one side in a religious conflict at the expense of the other, something the establishment clause plainly forbids." (Tribe, American Constitutional Law (1988) § 14-11, p. 1235.)

Members of this court may detest the practice of heavenly deception. We may abhor the results of the Church's selective (and successful) proselytization. We may condemn such practices as destructive of the integrity of the family.[9] Yet, as judges we must resist the temptation to tread into this theological thicket. For it is neither for governments, nor their instrumentalities, the courts, to divine the truth of those teachings. That is the law to which we are all bound.[10] I am satisfied that both the Court of Appeal and the trial court before it have correctly found the law and applied it to these appellants. Therefore, I would affirm the trial court's grant of summary judgment on the fraud, emotional distress and restitution counts.

---

[9] The Court of Appeal said it best: "The beguiling and very intensive recruiting methods of the Unification Church, which appear primarily directed at those young people who are most emotionally impressionable and vulnerable, seem objectionable to us, as doubtless they do to most disinterested observers."

[10] See Justice Mosk's eloquent concurring opinion affirming this principle when he voted to uphold the constitutionality of the death penalty, *People* v. *Anderson* (1968) 69 Cal.2d 613, 635 [73 Cal.Rptr. 21, 447 P.2d 117]: "As a judge I am bound to the law as I find it to be and not as I might fervently wish it to be."